SECURITIES AND EXCHANGE
COMMISSION

v.

FALSTAFF BREWING CORPORATION
and Paul Kalmanovitz, Appellants.

No. 79–1467.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 12, 1980.
Decided May 29, 1980.

Alfred H. Moses, Washington, D. C., with whom Jeffrey H. Howard, Washington, D. C., was on the brief, for appellants.

Rosalind C. Cohen, Sp. Counsel, Securities and Exchange Commission, Washington, D. C., with whom Jacob H. Stillman, Associate Gen. Counsel, Washington, D. C., was on the brief, for appellee.

Before McGOWAN, TAMM and ROBB, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

The Securities and Exchange Commission filed this action seeking to have the United States District Court for the District of Columbia enjoin the Falstaff Brewing Corporation and the chairman of its board and controlling stockholder, Paul Kalmanovitz, from future violations of certain provisions of the Securities Exchange Act of 1934 (Act), 15 U.S.C. §§ 78a–78hh (1976). After considering oral testimony, depositions, and documentary evidence, Judge Howard F. Corcoran held that both Falstaff and Kalmanovitz had violated the Act and issued the injunctions sought. *See SEC v. Falstaff Brewing Corp.,* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,583 (D.D.C. 1978). Falstaff and Kalmanovitz appeal, and we affirm.

## I. OVERVIEW

The facts of this case are intricate and will be developed more fully in discussing each challenge made to the district court's decision. For now, we shall summarize the overall factual background, the district judge's holding, and the grounds of appeal.

Falstaff, an independent, publicly owned brewer, suffered severe financial losses for several years in the late 1960's and early 1970's. In 1974 Falstaff sold its San Francisco brewery to the General Brewing Corporation, a company beneficially owned by Paul Kalmanovitz, a wealthy businessman active in the beer industry. General Brewing would continue to produce beer under the Falstaff name.

Following this transaction, Falstaff's management decided to probe Kalmanovitz to see if he was interested in investing in Falstaff itself. On March 10, 1975, Kalmanovitz entered into an agreement with Falstaff under which he would invest $10 million in cash and personally guarantee another $10 million in loans. In return, he would receive preferred stock sufficient to give him a majority voting interest in the company, together with an option to purchase more. Falstaff sent a proxy statement to the company's shareholders, who approved the transaction at an April 28 meeting.

After assuming control of Falstaff, Kalmanovitz failed to report his stock acquisition to the Commission for more than one year. In addition, Falstaff failed to file certain required reports with the Commission and filed others that the Commission believed were materially misleading.

In 1977 Falstaff issued another proxy statement to its shareholders, seeking approval to pay dividends on Kalmanovitz's preferred stock in common stock rather than in cash. The Commission contends that this proxy statement misstated certain material facts and omitted others. The Commission instituted this action to block the 1977 shareholders' meeting and to obtain a permanent injunction against Falstaff and Kalmanovitz ordering them not to violate certain provisions of the Act in the future.

After reviewing the evidence, Judge Corcoran concluded that Falstaff and Kalmanovitz committed the following violations:

(1) The 1975 proxy statement was false and misleading, a violation of section 14(a) of the Act, 15 U.S.C. § 78n(a) (1976), and rules 14a–3 and 14a–9 thereunder, 17 C.F.R. §§ 240.14a–3, –9 (1979). Both defendants now concede that the 1975 proxy statement was deficient, and Falstaff admits its liability. Kalmanovitz, however, contests the district court's holding that he, too, is liable for this violation.

(2) Kalmanovitz failed to make a timely filing of a Schedule 13D reporting his acquisition of Falstaff stock and thus violated section 13(d) of the Act, 15 U.S.C. § 78m(d) (1976), and rules 13d–1 and 12b–20 thereunder, 17 C.F.R. §§ 240.13d–1, .12b–20 (1979). Kalmanovitz does not challenge this holding.

(3) Falstaff failed to file or filed inaccurate reports on Forms 8–K, 10–K, and 10–Q during 1975 and 1976, violations of section 13(a) of the Act, 15 U.S.C. § 78m(a) (1976), and rules 13a–1, 13a–11, 13a–13, and 12b–20 thereunder, 17 C.F.R. §§ 240.13a–1, –11, –13, .12b–20

(1979). The defendants, though conceding that one report was deficient, contend that they filed all other required reports and that all filings were materially correct. Kalmanovitz also argues that the district judge made insufficient findings to hold him liable for aiding and abetting Falstaff in these violations.

(4) The 1977 proxy statement was materially deficient in several respects, a further violation of section 14(a) and rules 14a–9 and 12b–20. Both defendants raise challenges to particular statements or omissions the court held were violations.

(5) Both defendants violated section 10(b) of the Act, 15 U.S.C. § 78j(b) (1976), and rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5 (1979), through their errors in the 1975 and the 1977 proxy statements and in the 1975 and 1976 reports and through misstatements in a November 1975 letter that Kalmanovitz sent to Falstaff shareholders. Both defendants argue that the misstatements and omissions were immaterial and that the district judge was required to find that they acted with scienter.

On the basis of these and other findings, Judge Corcoran concluded that there existed a reasonable likelihood that the defendants would engage in further misconduct. He therefore enjoined them from violating these sections and rules in the future. Both defendants also challenge the injunctions.

We shall discuss, in order, the violations with regard to the 1975 proxy statement, the 1975 and 1976 reports, the 1977 proxy statement, and the section 10(b) violations. We then shall turn to the reasonable likelihood of further misconduct and the propriety of entering the injunctions.

## II. THE 1975 PROXY STATEMENT

Falstaff and Kalmanovitz concede that the proxy statement mailed to shareholders in April of 1975 was materially false and misleading in several respects, and Falstaff now admits its liability for these deficiencies. Kalmanovitz, however, contests his liability. He argues that because he was not yet a shareholder, an officer, or a director of Falstaff, the district court should not have held that he violated the Act and the relevant Commission rules. We nevertheless agree with Judge Corcoran that Kalmanovitz, as well as Falstaff, is liable for the misstatements.

### A. The Facts

At the time Kalmanovitz and Falstaff opened their negotiations early in 1975, Falstaff was in severe financial distress. It had lost $3.8 million in 1974. It owed $12.5 million in low-interest loans to two insurance companies and $16 million in notes and lines of credit to three banks, interest at 1½ % above prime. In the fall of 1974, these institutional lenders demanded that Falstaff pool all its assets, aside from accounts receivable and inventories, to secure the $28.5 million debt. In January 1975 the lenders executed a "Collateral Agency Agreement," under which they agreed among themselves to share all of Falstaff's payments on a pro rata basis. Falstaff's board of directors approved this arrangement on January 27, 1975. Later, on March 31, Falstaff acceded to the insurance lenders' demand that it acknowledge any failure to repay pro rata would constitute a default and thus would entitle them to call their loans immediately (the "March waivers").

In the meantime, Kalmanovitz and Falstaff completed arrangements for Kalmanovitz's investment in Falstaff. Kalmanovitz would purchase 100,000 shares of a new Class A preferred stock for $10 million, giving him a majority voting interest in Falstaff.[1] Additionally, Continental Can Company, a major supplier of cans to the brewery, had agreed to defer Falstaff's payment of $10 million in can purchases, provided that Kalmanovitz would personal-

---

1. Each of the 100,000 shares would have 45 votes. Because there were slightly fewer than 4.5 million shares of common stock outstand-

ing, the transaction would leave Kalmanovitz with 50.02% of the voting interest in Falstaff.

ly guarantee the underlying note. Kalmanovitz agreed. Finally, Kalmanovitz received an option to purchase another 100,000 shares of a new non-voting Class B preferred stock for $10 million in return for his guarantee on another $10 million in Falstaff accounts payable.

On March 10, 1975, Falstaff and Kalmanovitz signed an agreement reflecting these arrangements. The district court found that, at this time, Kalmanovitz already knew of the liens on Falstaff's assets and the pro rata restrictions in the Collateral Agency Agreement. He also knew by April 4 that Falstaff had agreed to the March waivers, including their provision that payment other than on a pro rata basis would be deemed a default on the $12.5 million in insurance loans. Kalmanovitz nonetheless planned to use the $20 million raised by Falstaff in the transaction ($10 million from Kalmanovitz and $10 million from deferral of payments to Continental Can) to pay off the $16 million in high-interest bank notes, even though doing so would violate the March waivers and the Collateral Agency Agreement. Kalmanovitz believed that the bank loans, with their high interest rate, were a "cancer" on the company.[2]

Falstaff's directors approved the Kalmanovitz transaction on March 31, 1975, and called a shareholders' meeting for April 28

to ratify the arrangement. In early April, the directors mailed a proxy statement to the shareholders. Kalmanovitz had seen a first draft of the proxy statement on or before March 22 and read the final version shortly after its distribution. After the latter reading, he thought that the statement was fraudulent but elected to say nothing about it.[3]

■ Judge Corcoran also concluded that the proxy statement was materially deficient in several respects. First, it failed to disclose two potential conflicts of interest: (1) Kalmanovitz's beneficial ownership of General Brewing Corporation, which had purchased Falstaff's San Francisco brewery and was producing Falstaff beer, and (2) Kalmanovitz's agreement to guarantee the Continental Can credit. Second, the proxy statement, though mentioning the loans from the banks and the insurance companies, did not apprise the shareholders of the defaults and liens, the Collateral Agency Agreement, the March waivers, or Kalmanovitz's plan to pay off the bank loans despite these restrictions. Third, the proxy statement failed to disclose with sufficient clarity that approval of the sale of stock to Kalmanovitz would give him effective control of Falstaff and would dilute the present shareholders' control.[4]

---

**2.** Falstaff was paying approximately 11% on the bank loans as opposed to 6% on the insurance loans.

**3.** Kalmanovitz contests this finding. At oral argument, counsel characterized Kalmanovitz's remarks as meaning that he thought the deal was fraudulent as to him, not as to the existing Falstaff shareholders. We do not believe, after examining the record, that the district court's finding was clearly erroneous. Moreover, we have difficulty understanding how a proxy statement could defraud a person who was not a recipient of it and who had more information than the statement contained.

**4.** The defendants challenge as clearly erroneous the district court's finding that the proxy statement did not disclose adequately Kalmanovitz's control and the dilution of the existing shareholders' interest. We disagree. Although on page 4 the proxy statement stated that Kalmanovitz would be entitled to name a majority of Falstaff's directors, see Joint Appendix (J.A.) at 225, no mention of this result appeared in

the discussion of the proposed charter amendments, see id. at 228–30. Disclosures that Kalmanovitz would purchase 100,000 preferred shares, that each share would have 45 votes, and that 4,496,625 common shares with one vote each were outstanding were spread over two pages of small print. See id. at 228–29. Nowhere did the proxy statement tell the shareholder that a vote to approve the transaction was a vote to transfer control of his company to Kalmanovitz.

No one disputes that the transaction's giving Kalmanovitz majority control is a material fact. Although "corporations are not required to address their stockholders as if they were children in kindergarten," Richland v. Crandall, 262 F.Supp. 538, 554 (S.D.N.Y.1967), disclosure may not be buried in a mass of information that, when pieced together, might give the correct impression. A court is not clearly erroneous when it finds inadequate a proxy statement that spreads over two pages the data necessary to calculate the impact of a proposed transaction on control of the company. See Gould v.

Based on these facts, Judge Corcoran concluded that both Falstaff and Kalmanovitz had failed to provide all the information Schedule 14A requires for a proxy statement[5] and had made omissions that rendered the proxy statement materially false and misleading. Therefore, they had violated section 14(a) of the Act and rules 14a–3 and 14a–9 thereunder.

## B. *Kalmanovitz's Liability*

Kalmanovitz contests his liability under section 14(a) of the Act. He argues that because he was not yet part of Falstaff's management, which issued the statement, and because he neither drafted the statement nor controlled its contents, he was under no obligation to correct any false or misleading information it contained. We do not agree.

■ As the Supreme Court has said time and again, any effort to construe a statute, including the securities laws, must begin with the language of the statute itself. *E.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). *Accord, e.g., Lewis v. United States,* 445 U.S. 55, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980). Section 14(a) of the Act forbids "any person . . . to solicit or to permit the use of his name to solicit any proxy" in violation of Commission rules. 15 U.S.C. § 78n(a) (1976).[6] By its

express terms, section 14(a) applies not only to one who himself solicits proxies but also to anyone who "permit[s] the use of his name" in the solicitation. Kalmanovitz's name appeared eleven times in the nine-page proxy statement, in three separate items. He saw a first draft over a week before it was issued and read the final version shortly after it was mailed to the shareholders. Thus, under the literal language of the statute, Kalmanovitz permitted his name to be used in the proxy solicitation.

■ Of course, the simple appearance of one's name in a proxy statement does not trigger liability for any misstatement appearing therein. Instead, there must have been "a substantial connection between the use of the person's name and the solicitation effort." *Yamamoto v. Omiya*, 564 F.2d 1319, 1323 (9th Cir. 1977). For example, this substantial connection is present in the case of director nominees listed in the proxy statement:

[N]ominees h[o]ld out their names. and reputations to shareholders as evidence that the group backing them [is] the proper choice to run the corporation. Having put their reputations in issue, the nominees cannot divorce themselves from improper actions taken in the proxy battle by the participants acting under the

*American-Hawaiian Steamship Co.*, 535 F.2d 761, 774 (3d Cir. 1976).

5. The current version of Schedule 14A appears at 17 C.F.R. § 240.14a–101 (1979).

6. In full, this subsection reads:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title [Act § 12].

15 U.S.C. § 78n(a) (1976).

Rule 14a–3 requires every proxy solicitation to conform to Schedule 14A. In a solicitation by management for the annual shareholders'

meeting, the statement must be accompanied by an annual report that complies with the specifications of Form 10–K, with some additions. 17 C.F.R. § 240.14a–3(a)–(b) (1979). Rule 14a–9 provides in relevant part:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

*Id.* § 240.14a–9(a).

banner of their names. Moreover, since the major object of the proxy contest [is] to install the nominees into positions where they would ostensibly control the corporation, all participants working for their election are in a sense agents of the nominees, and thus the nominees must be expected to assume some responsibility for the actions of their agents.

*Chris-Craft Industries, Inc. v. Independent Stockholders Committee,* 354 F.Supp. 895, 915 (D. Del. 1973).

We agree with the reasoning in *Chris-Craft* and believe it applies to the situation now before us.[7] Kalmanovitz's reputation as a businessman, his plans for Falstaff, and his other dealings that could create conflicts of interest were important to the existing shareholders, who were being asked to transfer control of the company to him. That the proxies nominally were sought by the management is not dispositive; in reality, it was Kalmanovitz who was seeking the shareholders' votes to approve his taking control. His connection with the transaction was more than substantial. It was pivotal. Thus, the district court properly concluded that he could be held liable for his failure to correct errors that he knew appeared in the proxy statement issued on his behalf.[8]

Our conclusion comports with the policy behind the regulation of proxy solicitations. In the words of Ferdinand Pecora, counsel to the Senate Committee on Banking and Currency when it considered the Act:

I think [section 14(a)] mak[es] it possible for every stockholder to learn in advance of his giving a proxy what the proxy is sought for, whether the request for the proxy comes from the management group or whether it comes from a minority group who want to use the proxy. It enables every stockholder to act intelligently with regard to the giving of his proxy, instead of putting him in a position where he gives his proxy through the process of signing a blank check.

*Stock Exchange Practices: Hearings Before the Sen. Comm. on Banking & Currency,* 73d Cong., 1st Sess. (pt. 16) 7716 (1934). Falstaff shareholders in effect were asked to sign just such a blank check when they received a proxy statement, nominally from the management, that failed to disclose material information needed for them to cast an intelligent vote. Permitting Kalmanovitz to escape liability would mean that anyone attempting to take control of a corporation could mislead the existing shareholders with impunity simply by finding a nominal solicitor willing to violate the law. The Supreme Court has written that "Congress intended securities legislation enacted

---

7. Kalmanovitz seeks to distinguish *Chris-Craft* because the directors' election there was contested. This difference in no way affects our analysis. This absence of an organized opposition does not reduce the obligation of proxy solicitors to be truthful and comprehensive in the material they distribute. Indeed, with no group actively fighting the transaction, solicitors arguably are subject to a greater duty: no opposition is presenting the other side.

8. Kalmanovitz relies on the facts in *Yamamoto v. Omiya,* 564 F.2d 1319 (9th Cir. 1977), which articulated the "substantial connection" standard, *see* p. 68 *supra,* to support his position. We do not believe that case is apposite here. In *Yamamoto,* the Court of Appeals for the Ninth Circuit refused to hold the purchaser of a building liable for errors in a proxy statement sent to the seller's shareholders seeking their approval of the sale. The court reasoned that the purchaser had no control over the statement's contents and that the identity of the purchaser probably did not induce shareholders

to vote for the sale. *See id.* at 1323. In the case before us now, Kalmanovitz was seeking to take control of the company itself, and information about him and his plans certainly was material to the shareholder deciding whether to give his proxy to persons supporting the transaction.

Kalmanovitz also argues that the district court erred in remarking that the information relating to the Continental Can transaction and the plans to retire the high-interest debt, which the proxy statement failed to disclose, "was information which rested primarily with Kalmanovitz." *SEC v. Falstaff Brewing Corp.,* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ' 96,583, at 94,469 (D.D.C. 1978). We do not believe, however, that Kalmanovitz's relative knowledge is important; rather, what is relevant is Kalmanovitz's awareness of this information and his failure to disclose it when he concluded that the proxy statement was fraudulent.

for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972) (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963)). Kalmanovitz's conduct falls within the purpose, as well as the literal language, of a statute designed to give shareholders complete and accurate information when voting on corporate policy. We therefore conclude that Judge Corcoran properly held him liable under section 14(a) and the Commission's rules thereunder.

## III. VIOLATIONS OF SECTION 13(a)

The district court also held Falstaff and Kalmanovitz liable for failing to file required reports and for filing inaccurate reports with the Commission. Specifically, Falstaff did not file a Form 8–K when Kalmanovitz went forward with his plans and prepaid the bank loans, when the insurance lenders thereafter declared a default under the March waivers, or when Falstaff issued a note to Continental Can for the payment deferrals. A Form 8–K filed in January of 1976 noted the litigation with the insurance lenders but, in the district court's view, did not reveal adequately the basis of the action and thus was materially false and misleading. In addition, at no time did Falstaff or Kalmanovitz correct the errors made in the 1975 proxy statement. Falstaff and Kalmanovitz challenge these conclusions and some of the facts underlying them. Kalmanovitz in addition asserts that Judge Corcoran's failure to make an explicit finding that he aided and abetted Falstaff's violations precludes any finding of personal liability on his part.[9]

### A. *Current Reports on Form 8–K*

Section 13(a) requires all issuers subject to the Act's registration requirements to submit periodic reports to the Commission containing such information as the Commission may direct through its rules. 15 U.S.C. § 78m(a) (1976).[10] The Commission, pursuant to this authority, has directed every registrant to notify it on a Form 8–K of large acquisitions and dispositions of assets, declarations of bankruptcies or receiverships, director resignations, and other major corporate events whenever these events occur; other information must be reported annually on a Form 10–K. *See* 17 C.F.R. §§ 240.13a–1, –11 (1979).[11] Under

9. The district court also held that the defendants had violated rule 13a–13, 17 C.F.R. § 240.-13a–13 (1979), and rule 12b–20, *id.* § 240.12b–20, with regard to Falstaff's filings of quarterly reports on Form 10–Q. We have discovered no findings of fact concerning the filing of Form 10· Q's, but the defendants have not challenged this absence. Therefore, we decline to comment on the correctness of this holding. We do note, however, that all Form 10–Q requires is a statement that the registrant has made all necessary reports during the past 12 months and has been subject to the reporting requirements for the past 90 days. SEC Form 10–Q, *reprinted in* 4 Fed.Sec.L.Rep. (CCH) ⁋ 31,031 (1979). Any misstatement on this form thus would be cumulative of the errors and omissions found on Forms 8–K and 10–K.

10. This subsection provides:
 Every issuer of a security registered pursuant to section 78*l* of this title [Act § 12] shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security—

(1) such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 78*l* of this title, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.
(2) such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe.
Every issuer of a security registered on a national securities exchange shall also file a duplicate original of such information, documents, and reports with the exchange.
15 U.S.C. § 78m(a) (1976).

11. Rule 13a–1 requires a registrant to file an annual report on Form 10–K. Rule 13a–11 requires a Form 8–K whenever certain events listed in the form's instructions transpire. *See* text. For the current versions of these forms,

rule 12b–20, a company filing a report must include such additional information as will make the filing not misleading under the surrounding circumstances. *Id.* § 240.12b–20.[12]

■ In January of 1976, Falstaff filed a Form 8–K stating that it had paid off the bank loans and had entered court seeking a declaration of the rights of the various parties to the insurance loans.[13] Judge Corcoran concluded that this statement violated rule 12b–20 because it failed to disclose that Falstaff had agreed to the pro rata repayment on March 31, 1975, and that Falstaff's prepayment of the bank loans was what triggered the insurance lenders to declare their loans in default. Falstaff and Kalmanovitz, however, believed that this information was obvious from the language of the completed form.

We believe Judge Corcoran properly found that the January 1976 Form 8–K failed to disclose needed information. The Form 8–K nowhere mentions that Falstaff itself had agreed to pro rata repayment.

Instead, it states flatly that Falstaff "had never been in default" and then reports that the insurance lenders alleged Falstaff was in default. Joint Appendix (J.A.) at 340, *quoted in* note 13 *supra*. The omission of any description of the March waivers executed by Falstaff makes the Form 8–K misleading. Only by a painstaking reading could one perhaps infer that the prepayment was the ground of the default, thus making the suit more than a vexatious action brought by one group of lenders dissatisfied that another group had been prepaid. By failing to disclose in the Form 8–K material information necessary to make the statements in it not misleading, Falstaff and Kalmanovitz violated rule 12b–20.

### B. *Annual Reports on Form 10–K*

■ In a description of its antitrust action against the insurance company lenders, Falstaff's 1975 Form 10–K stated:

Current lenders are claiming default by the Registrant under convenants [*sic*] of

---

see 4 Fed.Sec.L.Rep. (CCH) ¶¶ 31,001–04 (1979) (Form 8–K); *id.* ¶¶ 31,101–08 (1980) (Form 10–K).

**12.** As a preliminary matter, we note that the defendants concede a Form 8–K filed in October of 1975 did not adequately discuss pending litigation between Falstaff and the insurance lenders and thus violated rule 12b–20. This Form 8–K mentioned that the company was the plaintiff in an antitrust and fraud action brought against the insurance lenders. It did not state, however, that Falstaff had filed this action to have the court declare the Collateral Agency Agreement, the March waivers, and the lenders' declarations of default invalid.

In addition, we decline to rule on the defendants' contention that the bank and the insurance loans and the Continental Can credit were not securities and thus Form 8–K as it then read did not oblige Falstaff to report the payment of the bank loans, the insurance lenders' declaration of default, and the issuance and payment of the note to Continental Can. (Form 8–K at the time required reports only on changes and defaults on "securities.") The defendants, in their objections before the district court to the Commission's proposed conclusions of law, did not raise the issue of whether the loans and notes were securities. *See* J.A. at 187 (arguing only overtechnicality, immateriality, and ultimate disclosure). We will not permit them to embark on this theory for the

first time on appeal. Judge Corcoran's ruling must stand.

**13.** The Form 8–K read, in relevant part:

Falstaff paid off all its outstanding bank loans during the summer of 1975, thereby eliminating more than $16,000,000 in high-interest indebtedness. Once Falstaff had made these payments, New York Life Insurance Company and Mutual Life Insurance Company of New York threatened suit based on Falstaff's failure to permit the insurance companies to share in these pre-payments according to pre-arranged terms set by these same companies. *Falstaff had never been in default on its payment obligation to these insurance companies.*

In August, 1975, Falstaff filed an action for a declaratory judgment against the four banks and two insurance companies, asking the Court to determine the rights and duties of the parties under the various contracts relating to the Falstaff loans. Both the New York Life Insurance Company and the Mutual Life Insurance Company of New York responded by filing counter-claims against Falstaff. The suit alleges that Falstaff was in default under the terms of its promissory notes with the insurance companies, and demands acceleration of the repayment of all outstanding principal under said notes.

J.A. at 340 (emphasis added).

the original lending agreements and also a default resulting from an agreement dated March 25, 1975 requiring the Registrant to payoff its long-term lenders on a pro-rata basis, and are demanding acceleration of the repayment of all principal outstanding under said Notes.

J.A. at 285. The district court found this passage misleading because it did not disclose that Falstaff's prepayment of the bank loans had led the insurance lenders to declare a default. The court then concluded that the Form 10-K's violated rule 12b–20 by failing to describe adequately Falstaff's relations with its lenders, the litigation with them, the pro rata restrictions, the bank loans, and the subsequent declarations of default.

Again, we do not believe that Judge Corcoran's finding was clearly erroneous. The Form 10-K states only in the most general of terms the basis of the lenders' case, i. e., Falstaff's alleged violation of the March waivers and the Collateral Agency Agreement; it does not discuss the nature of the violations or the events underlying the claimed breaches. Failure even to mention facts as material as Falstaff's own agreement to repay the loans pro rata misleads investors and shareholders by denying them critical information about major litigation and, indirectly, about the performance of the company's management. With the disclosure presented in a materially misleading way, we affirm the district court's holding that this Form 10-K violated rule 12b–20.[14]

## C. *Kalmanovitz's Liability*

 Kalmanovitz argues vociferously that even if the Form 8-K's and 10-K's violated the Act and the relevant Commission rules, the district court did not expressly make the findings of fact and conclusions of law necessary to render him liable as an aider and abettor.[15] To hold that a defendant aided and abetted another's violation, a court must conclude that a wrongful act occurred, that the defendant was aware of it, and that he knowingly and substantially participated in it. *Gould v. American-Hawaiian Steamship Co.*, 535 F.2d 761, 779 (3d Cir. 1976). Our previous discussion amply confirms that a variety of violations of the reporting requirements did indeed occur. The district court also found Kalmanovitz's participation in this wrongdoing to have been both knowing and substantial. Thus, we conclude he may be held liable despite the absence of an express conclusion of law in the district court's opinion.

In discussing the facts surrounding the filing of the Form 8-K's and 10-K's, the district court several times found Kalmanovitz to have been a knowing and active participant. First, on August 29, 1975, outside counsel to Falstaff sent Kalmanovitz a copy of a letter that expressed concern over Falstaff's compliance with the securities laws. The letter explicitly recommended filing a Form 8-K regarding the declarations of default. Second, Kalmanovitz directly participated in the decision not to include a description of the loan defaults in

---

14. The defendants assert that the omission of the Continental Can transaction was immaterial because Falstaff regularly purchased cans from Continental and the arrangement simply deferred payment. We disagree. The amount of the note ($11.6 million) and its term (two years) suggest that it was more than a routine payment scheme. We do not believe Judge Corcoran's finding was clearly erroneous.

The defendants also argue that failure to include the Continental Can transaction on the 1976 Form 10-K was immaterial because the loan was repaid fully in 1975. The district court's opinion is somewhat vague on this point. It nowhere expressly finds that this omission was material, but it lists the Continental Can transaction among several deficiencies that apply to both the 1975 and the 1976

Form 10-K's. *See SEC v. Falstaff Brewing Corp.*, [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ⁋ 96,583, at 94,462, 94,471 (D.D.C.1978). Because this error is merely cumulative of the other deficiencies found in the 1976 Form 10-K, we do not believe it necessary to determine precisely what the district court held, for even if its conclusion were improper, remand on this point would be unnecessary.

15. Kalmanovitz also raised the possibility that the district court may have been acting under § 20 of the Act, 15 U.S.C. § 78t (1976), which provides liability for controlling persons. The Commission has not pursued this alternative basis for liability before us, so we do not discuss it.

the 1975 Form 10–K but instead to mention them in the disclosure relating to the antitrust litigation. Third, Kalmanovitz knew that Form 8–K required a disclosure of all significant litigation. Fourth, Kalmanovitz participated in the drafting of the January 1976 Form 8–K with its insufficient description of the litigation. Fifth, Kalmanovitz at the time considered the acceleration of the insurance company loans, if enforceable, to be a substantial threat to Falstaff's financial future. Kalmanovitz does not claim that any of these findings is clearly erroneous.[16]

Despite these express findings of fact, Kalmanovitz argues that the district court could not hold him liable under section 13(a) without explicitly stating that he was an aider and abettor. Having reviewed Judge Corcoran's opinion thoroughly, we disagree. We do not believe that when a judge makes ample and unambiguous findings of fact, his conclusion that the defendant violated the law must be overturned simply because he did not state the theory he obviously was using *in haec verba*. The Commission charged Kalmanovitz in part on an aiding-and-abetting theory. *See* J.A. at 1 (complaint). The opinion of the district court laid all the necessary predicates for Kalmanovitz's liability under such a theory and then expressly concluded that he was liable. That it neglected to state explicitly one link

in the chain is regrettable, but this omission does not undermine the chain, the validity of the link clearly implied, or the strength of the ultimate conclusion. We therefore affirm Kalmanovitz's liability under section 13(a) and rules 13a–1, 13a–11, and 12b–20.

Interpolating facts and legal theories from insufficiently thorough opinions is not an exact science, but this observation does not mean we cannot make inferences when the route to them is short and safe. We strongly believe that district courts should lay out their findings and conclusions clearly, and we will remand for illumination when we are left in the dark. Nevertheless, we may proceed when the light, though slightly dimmed, is nonetheless amply bright to guide us in our review. *See SEC v. Savoy Industries, Inc.*, 587 F.2d 1149, 1168 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979).[17]

## IV. THE 1977 PROXY STATEMENT

In April of 1977, Falstaff sent to its shareholders a proxy statement for its upcoming annual meeting.[18] The statement solicited proxies for the election of directors, including the reelection of Kalmanovitz, and for an amendment to the corporation's charter that would permit it to pay Kalmanovitz the dividends due on his pre-

---

**16.** We also note that Kalmanovitz signed all the forms actually filed.

**17.** Kalmanovitz cites *Savoy* in support of his position. We believe, however, that the situation that confronted us in *Savoy* differs markedly from the one before us now. The district court in *Savoy* had found that certain filings had been deficient and then had held the defendant liable, stating simply that the defendant's group had been in control. On appeal, we noted the absence of any findings of fact concerning the defendant's personal participation. 587 F.2d at 1170. We also described the absence of any findings of facts or conclusions of law pertaining to a good-faith defense under § 20(b) of the Act, 15 U.S.C. § 20t(b) (1976). 587 F.2d 1170–71. Our decision to remand rested on our inability to infer exactly what formed the basis of the district court's holding. Indeed, on another issue in the case, we held, "The absence of an express finding on the probability of future violations by the district court does not impair our ability to sustain the

district court's injunction where the necessary factors are so obviously present." *Id.* at 1168.

Judge Corcoran's opinion contains explicit findings on Kalmanovitz's participation in and knowledge of the § 13(a) violations. No good-faith defense exists under that section. As we note in the text, findings are present on all the elements of aiding and abetting, followed by the ultimate conclusion of liability. All that is missing is a statement that aiding and abetting is the theory underlying the conclusion. This omission is a far cry from the multitude of missing findings and conclusions in *Savoy*.

**18.** The meeting was not held. On May 10, the Commission staff notified Falstaff that it was authorized to institute this action. The Commission filed a motion for preliminary relief to block the meeting on May 27. By stipulation entered June 1, Falstaff agreed not to hold the meeting or solicit proxies for it until the district court ruled on the granting of interim relief.

ferred stock in common stock rather than cash. This transaction would increase Kalmanovitz's voting interest in Falstaff.

The district court found the 1977 proxy statement materially deficient in several respects. First, it did not disclose Kalmanovitz's voting control of Falstaff. Second, it did not detail (1) the number of common shares Kalmanovitz would receive under the proposed transaction, (2) the source of the common stock, (3) the amount payable to Kalmanovitz under the existing terms of the preferred stock, or (4) background information explaining how the proposal would conserve Falstaff's cash resources. Third, the statement referred to an audit committee that in fact never met. Fourth, it stated that the Commission had "no comment" on the proxy statement when, in fact, the Commission had informed Falstaff that it regarded the statement to be materially deficient.[19]

Falstaff and Kalmanovitz argue that the proxy statement adequately disclosed Kalmanovitz's control and potential conflicts of interest and that the references to the audit committee were not false and misleading.

They contend any omissions were trivial items of little concern to investors.[20] We disagree and affirm Judge Corcoran's findings and his conclusion that the omissions violated section 14(a) and rules 14a–9 and 12b–20.

## A. Kalmanovitz's Control

The district court held that the 1977 proxy statement was materially false and misleading, in part because it did not disclose adequately that Kalmanovitz controlled Falstaff and its board. The court believed that a clear statement of his control was needed to place the board's recommendation of a stock dividend to Kalmanovitz in perspective: shareholders then could vote on the proposal knowing not only that Kalmanovitz had a vital interest in the approval of the stock dividend but also that he controlled the board that ultimately would vote on it.

The 1977 proxy statement said only: "Mr. Paul Kalmanovitz, who is Chairman of the Board of the Company, has a direct interest in this matter as a result of his beneficial

---

**19.** Falstaff filed a preliminary copy of the proxy statement with the Commission about March 28, 1977. See 17 C.F.R. § 240.14a–6(a) (1979). The Commission advised Falstaff on April 6 that the statement was materially deficient and that any dissemination of it would be at Falstaff's own risk. J.A. at 776 (letter from Falstaff's general counsel acknowledging receipt of this message and asking for information on the specific nature of the deficiencies). The Commission declined to give detailed comments. See id. § 202.3(a) (Commission ordinarily does not give comments "when the deficiencies appear to stem from careless disregard of the statutes and rules or a deliberate attempt to conceal or mislead"). Instead of reporting that the Commission believed the statement was materially deficient, Falstaff simply added the following rider to the statement, which it then mailed:

> In accordance with the rules and regulations of the United States Securities and Exchange Commission, this Notice of Annual Meeting of Shareholders and Proxy Statement was submitted to the SEC in advance of mailing. *The SEC has taken a "no comment" position relative to this proxy statement.* The Company, in the interest of its shareholders, has proceeded with the mailing of this Proxy Statement without having received any formal comments from the SEC.

> In the event that the SEC later objects to any item or items to be voted upon, the votes as tabulated by the Company respecting any such item or items will not become effective until such time as such objections have been resolved.

J.A. at 253 (emphasis added). Obviously, this remark substantially misrepresented the Commission's position. The defendants do not appear to challenge the district court's finding that this passage was false and misleading.

**20.** The district court also held that Falstaff violated § 14(a) and the relevant rules by failing to correct in the 1977 proxy statement the errors made in the 1975 proxy statement. The defendants argue that the rules do not require correction of all misstatements and omissions made in earlier solicitation materials. We need not reach this difficult question, however. The 1977 proxy statement contained ample mistakes for the district court to support its conclusion that it violated the Act and the rules. Failure to correct the 1975 errors, if a violation, is purely cumulative. Thus, even if we were to reverse this holding, multiple violations with regard to the 1977 proxy statement and other areas would remain. A reasonable likelihood of future violations still would be present.

ownership of 100% of the Class A Preferred Stock outstanding." J.A. at 253. This passage does not suggest that he also held a majority voting control, could name a majority of the directors, and in fact was in command of the company and its board. Thus shareholders might not know Kalmanovitz controlled the very management that was recommending approval and soliciting the common stockholders' proxies. We therefore agree that Falstaff's failure to make this potential conflict clear rendered its comments on the conflict of interest misleading. The defendants thereby violated section 14(a) and rules 14a–9 and 12b–20.[21]

### B. *The Audit Committee*

The 1977 proxy statement also referred to an audit committee consisting of Kalmanovitz and two other directors. Judge Corcoran found that in fact this committee never met or functioned. He concluded that mentioning this nonexistent committee created the false impression that the board of directors was exercising careful oversight of the company's finances; the statement, therefore, was false and misleading.

The defendants attempt to undermine this finding by submitting that even if not functioning as a formal committee, the named individuals were overseeing the company's finances and thus the statement was not false. We nevertheless believe that the district court's finding was not clearly erroneous. The existence of a committee implies a structured investigation and analysis of a company's fiscal welfare. Informal procedures may be adequate, but formal entities such as committees create at least the impression of great care and precision through detailed review and oversight. Stating that an audit committee, with its implication of careful oversight, existed when it did not thus is misleading, particularly when the proxies are being sought for a meeting at which directors will be selected; *i. e.*, when one major issue before the shareholders is whether to retain the current management. Therefore, we agree that this statement in the 1977 proxy materials was false and misleading and that its inclusion violated the Act and the relevant rules.

## V. SECTION 10(b) AND RULE 10b–5

The district court also held that Falstaff and Kalmanovitz had violated section 10(b) of the Act, 15 U.S.C. § 78j (1976),[22] and rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5 (1979).[23] These provisions prohibit manipu-

---

**21.** The district court also held that the failure to disclose Falstaff's control violated item 5 of Schedule 14A, 17 C.F.R. § 240.14a–101 (1979). The defendants argue that the rule governs only changes in control since the beginning of the last fiscal year. *See id.* (item 5(f)). Because we have concluded that the failure to describe Kalmanovitz's control violated the Act and rules 14a–9 and 12b–20, we need not decide whether this omission also violated Schedule 14A. The Schedule 14A violation would be simply a different characterization of the same underlying misconduct.

**22.** This section reads, in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (1976).

**23.** This rule reads:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

lative and deceptive practices in the purchase and sale of securities. The district court found that Falstaff and Kalmanovitz engaged in such practices in submitting a misleading proxy statement to shareholders in 1975, in failing to file or filing inaccurate reports, in misleading Falstaff shareholders in a 1975 letter,[24] and in distributing another misleading proxy statement in 1977.[25] The defendants challenge the materiality of the omissions and errors and also contend that the district court did not make a proper finding of scienter, which, they argue, is a prerequisite to liability in a Commission enforcement action. We affirm the district court's determinations in all respects.

### A. Materiality

■ We need pause but briefly on the defendants' arguments that the misstatements and omissions were immaterial. Materiality is a question of fact, and information is material if "there is a substantial likelihood that a reasonable shareholder would consider [information] important in

deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Our discussions of the violations of sections 13(a) and 14(a) and the rules thereunder amply demonstrate that Falstaff and Kalmanovitz indeed made false and misleading statements and omitted information necessary to make other remarks not false or misleading. Their attempt to contest materiality here is meritless.

### B. Scienter

■ The Supreme Court has held that in private actions under rule 10b–5, the plaintiff must prove that the defendant acted with scienter, *i.e.*, "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12, 96 S.Ct. 1375, 1381 & n.12, 47 L.Ed.2d 668 (1976). The Court has not yet decided whether the Commission must prove scienter in an administrative enforcement proceeding. *See id.* at 193 n.12, 96 S.Ct. at 1381 n.12.[26] Judge Corcoran declined to decide this ques-

17 C.F.R. § 240.10b–5 (1979).

**24.** This letter, sent over Kalmanovitz's signature as the new chairman of Falstaff's board, stated in part:

> For your information, Falstaff paid off all its outstanding bank loans in full during the summer of this year, thereby eliminating more than $16,000,000 in high interest indebtedness. When Falstaff made these payments, New York Life Insurance Company and Mutual Life Insurance Company of New York threatened Falstaff with a lawsuit because we did not permit the insurance companies to share in the prepayments according to the terms of an agreement which the lenders had made between themselves. However, Falstaff had never been in default of its payment obligations to these insurance companies, and never will be.
>
> Falstaff has been advised by its attorney, Mr. Joseph L. Alioto of San Francisco, that the agreement between the insurance companies and the banks to share any loan prepayments constituted a clear violation of the antitrust laws, threatening the financial stability of Falstaff. Based upon this advice, Falstaff is now in the process of filing an antitrust lawsuit against the New York Life Insurance Company, the Mutual Life Insurance Company of New York, and four major banks, alleging that these lenders agreed among themselves to allocate lending oppor-

tunities, to pool their interests in certain lending agreements with Falstaff, and to pool any prepayments by Falstaff under those lending agreements, all to the financial detriment of Falstaff. Your management has instructed its attorneys to prosecute these matters vigorously to the full extent of the law. J.A. at 772. The district court found that these remarks were misleading in failing to disclose Falstaff's acquiescence to the Collateral Agency Agreement or its execution of the March waivers. We do not believe this finding is clearly erroneous.

**25.** On three occasions, we have declined to resolve the defendants' challenges to specific findings because the district court's decisions that violations occurred in these instances were simply cumulative of other findings that we have affirmed. *See* notes 14, 20 & 21 *supra*. Liability under § 10(b) and rule 10b–5 depends in part, at least arguably, upon these violations. Nevertheless, there remain ample other violations that we have affirmed or that the defendants have conceded underlying the § 10(b) and rule 10b–5 liability, and any error regarding these three violations would be harmless.

**26.** This issue is presently before the Court in *Aaron v. SEC*, —— U.S. ——, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), *on cert. to* 605 F.2d 612 (2d Cir. 1979).

tion, for he found that the Commission had proved scienter on the facts before him.

Falstaff apparently does not challenge the finding of scienter on its part. Kalmanovitz, however, argues that the district court could not find that he acted with scienter. We disagree. In discussing scienter, the district court specifically restated its earlier conclusion that Kalmanovitz had known of the material omissions and misstatements in the 1975 proxy statement, a conclusion that we have affirmed, see pp. 68–70 supra. It also reiterated that Kalmanovitz had known of the errors in the 1977 proxy statement. Moreover, in conjunction with the violations of section 13(a), the district court concluded that Kalmanovitz had known of the omissions and failures to file. See pp. 72–73 supra.

Kalmanovitz contends that scienter requires an inquiry into "the defendant's state of mind—his subjective belief as to the legality of his action . . . ." Brief of Appellants at 41. We strongly disagree. Knowledge means awareness of the underlying facts, not the labels that the law places on those facts. Except in very rare instances, no area of the law—not even the criminal law—demands that a defendant have thought his actions were illegal. A knowledge of what one is doing and the consequences of those actions suffices. We therefore hold that because Kalmanovitz knew the nature and consequences of his actions, he acted with scienter.[27]

## VI. THE INJUNCTIONS

The district court entered orders enjoining Falstaff and Kalmanovitz, their agents, and their employees from committing further violations of the securities laws. Because prospective relief is designed to prevent future misconduct rather than to compensate for or to punish past violations, see Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944), cited in SEC v. Savoy Industries, Inc., 587 F.2d 1149, 1168 (D.C. Cir. 1978), cert. denied, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979), the court must determine " 'whether the defendant's past conduct indicates . . . that there is a reasonable likelihood of further violation[s] in the future.' " SEC v. Savoy Industries, Inc., 587 F.2d at 1168 (quoting SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 99 (2d Cir. 1978) (emphasis in original)). Falstaff and Kalmanovitz challenge the injunctions by reiterating earlier assertions of incorrect analysis of the evidence, by raising new objections to certain additional findings of fact, and by arguing that the Commission did not demonstrate a reasonable likelihood of further violations. We conclude that Judge Corcoran acted properly.

### A. Factual Basis of the Injunctions

In addition to the violations discussed above,[28] the court relied on addition-

27. Several courts of appeals have held that a reckless disregard for the consequences of one's actions is enough to demonstrate scienter in an action under rule 10b–5. See e.g., Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 46 (2d Cir.), cert. denied, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); Coleco Industries, Inc. v. Berman, 567 F.2d 569, 574 (3d Cir. 1977), cert. denied, 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978); First Va. Bankshares v. Benson, 559 F.2d 1307, 1314 (5th Cir. 1977), cert. denied, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); Sanders v. John Nuveen & Co., 554 F.2d 790, 792 (7th Cir. 1977). Accord, Nassar & Co. v. SEC, 566 F.2d 790, 794–95 (D.C. Cir. 1977) (Leventhal, J., concurring). Cf. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S.Ct. 1375, 1381 n.12, 47 L.Ed.2d 668 (reserving question of whether scienter includes recklessness). We need not decide whether recklessness alone suffices, for we have held that Kalmanovitz acted knowingly. Of course, because knowledge embraces recklessness, our conclusion that Kalmanovitz acted knowingly a fortiori includes a conclusion that he acted at least recklessly.

28. Our decision not to reach three issues because the violations involved would simply be cumulative, see notes 14, 20, 21 & 25 supra, also does not hamper our upholding the injunctions. Because they are cumulative, we do not believe that these particular violations were the proverbial straws that broke the camel's back, and the absence of an express finding that the remaining violations would have been enough does not undermine the reasonable likelihood of future misconduct. See SEC v. Savoy Indus., 587 F.2d 1149, 1168 (D.C. Cir. 1978) ("absence of an express finding on the probability

al factors in deciding whether to issue the injunctions. Specifically, it found that Falstaff had continued to seek proxies under the 1977 statement despite warnings from the Commission and Falstaff's employees of the statement's serious inadequacies. Moreover, Falstaff board members failed to file certain disclosure forms under the Act, and Falstaff had falsely represented to the court that its brewer's bond had been cancelled on account of the litigation in this case. The defendants contend that these findings by the district court could not support the injunctions. We disagree.

### 1. Disregard of Warnings

The defendants do not dispute the district court's finding that they continued to solicit proxies with the 1977 statement even after the Commission informed the company that it regarded the document as being materially deficient. Instead, they argue that a judge may not take this conduct into account in evaluating the likelihood of future violations. They believe that a court may not fault a party for persisting in its belief that its conduct is lawful and acting on that behalf, at least until a court holds the party in violation of some legal duty.

In the present context, we believe that the district court could consider Falstaff's proceeding with the 1977 proxy statement. That document, we have concluded, was indeed deficient. The Commission so warned Falstaff. The company's own employees questioned the adequacy of the disclosures. Failure to follow Commission—and internal—advice may not be a violation itself, but it surely suggests that in the future, apprised again of potential violations, Falstaff might proceed undeterred as it did in 1977. Ignoring warnings of possible violations is relevant to the particular task facing a judge in ruling whether to grant an injunction; namely, assessing the

likelihood that a defendant will violate the law again.

### 2. Reports by Directors

Falstaff also maintains that the failure of certain executives to file reports under section 16(a) of the Act, 15 U.S.C. § 78p(a) (1976),[29] does not demonstrate a propensity for Falstaff to violate the Act in the future. Falstaff characterizes the violations as overly technical and not probative. Again, we must conclude that Judge Corcoran could consider this information and decide that it indicated a likelihood of future misconduct. Whether due to ignorance, neglect, or conscious decision, noncompliance with section 16(a) does evince a disregard of the securities laws that may manifest itself in noncompliance elsewhere. Moreover, these violations involved several members of Falstaff's board other than Kalmanovitz. Misconduct by multiple directors surely suggests that Falstaff might continue shirking its legal duties.

### 3. Brewer's Bond

Falstaff, in a letter from counsel dated July 1, 1977, informed the district court that "the bond which is required of every brewery by federal law to ensure payment of taxes has been cancelled by Falstaff's bonding company as a result of this suit." J.A. at 817. The district court found that this representation was false and used it as further evidence pointing to a likelihood of future violations.

The defendants argue that the statement was not false and that its use was unfair surprise. We disagree. Although Falstaff points to several factors that it claims make this representation accurate in context, we have found nothing in the record indicating that any insurer actually had cancelled a

of future violations by the district court does not impair our ability to sustain the district court's injunction where the necessary factors are so obviously present"), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979).

**29.** This provision requires officers, directors, and persons having a beneficial ownership to-

talling 10% or more of any class of equity securities to file reports on any acquisitions or changes in outstanding amounts of those securities. 15 U.S.C. § 78p(a) (1976). The report is filed on Commission Form 3 or 4. *See* 17 C.F.R. § 240.16a–1 (1979).

brewer's bond.[30] Moreover, Falstaff itself raised the bonding issue, Kalmanovitz discussed the bonding situation at some length in his deposition, and the Commission also deposed officials of bonding companies. We can find no element of unfair surprise in using a misrepresentation made directly to the court when both parties delved into the underlying facts in discovery and in exhibits filed during the proceedings.[31]

## B. *Likelihood of Future Violations*

The defendants' major objections come in the district court's analysis of the facts and its conclusion that both defendants are reasonably likely to violate the securities laws again. Principally, the defendants argue that despite their number, all the charges ultimately stem from the mistakes made in the 1975 proxy statement. The management that prepared that statement is no longer with Falstaff; therefore, Falstaff is not likely to make the same errors in the future. Moreover, Kalmanovitz, due to his age and his purported good-faith efforts to comply with the securities laws, is not likely to commit further violations. We find that these objections lack merit and therefore affirm the granting of the injunctions.

### 1. *Relation to the 1975 Proxy Statement*

We cannot agree with the defendants that all the relevant errors relate to the 1975 proxy statement and thus to management no longer with Falstaff. Many of the violations result from failure to file accurate reports with the Commission after the

new management took over. *See* pp. 70–72 *supra.* In addition, the new management prepared the 1977 proxy statement, *see* pp. 73–75 *supra,* and is responsible for the misstatements in the November 1975 letter to Falstaff shareholders, an October 1975 letter to the Commission, and the July 1977 letter to the district court concerning brewer's bonds. Kalmanovitz, we have held, was himself liable for the 1975 proxy violations, and the failures to file under section 16(a) are violations by the present directors. Although the sins of the corporate fathers should not be visited upon succeeding generations of management, *see SEC v. Cenco, Inc.,* 436 F.Supp. 193, 199 (N.D. Ill. 1977), the transgressions here were the acts and omissions of persons currently in control of Falstaff. Ample evidence of repeated misconduct supports the district court's remark that these errors "have not been isolated or random, but rather have been part of a chronic pattern of violations, which has continued up to the present time." *SEC v. Falstaff Brewing Corp.* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,583, at 94,472 (D.D.C. 1978). Judge Corcoran's conclusion that these factors indicate a reasonable likelihood of future violations and his concomitant decision to issue an injunction were proper.

### 2. *Kalmanovitz's Good Faith*

At oral argument, counsel contended vigorously that we should vacate the injunction against Kalmanovitz because any errors on his part occurred due to ignorance and not to bad faith.[32] He always sought to

---

**30.** Falstaff and Kalmanovitz try to explain away this statement by pointing to three facts: one carrier's statement in May of 1977 that it would require more liquid collateral, Falstaff's having called several other carriers in search of better terms, and subsequent calls from brokers seeking information about this litigation. We do not see how the defendants can combine these factors to support a statement that any insurer actually cancelled a bond due to the filing of this action. The remark in the letter is clearly false.

**31.** The defendants also argue unfair surprise with regard to the district court's finding that an October 1975 letter sent by Falstaff to the Commission was false in stating that Falstaff

had retained new accountants. In its brief, the Commission pointed to a trial brief in which it brought this letter to the court's attention. The defendants have not responded to this revelation, and we take this silence as meaning that they no longer contend Judge Corcoran's use of this letter was unfair. In any event, because the letter was used only to suggest that the defendants had made misstatements to the Commission, it is purely cumulative of the rest of the evidence. *Cf.* pp. 79–80 *infra* (Kalmanovitz's good faith).

**32.** In our discussion of scienter, we held that knowledge of one's actions and their consequences is all the law requires; a demonstration of a subjective belief that those actions are

comply with the law, according to counsel; he simply misunderstood his legal duties.[33] Assuming arguendo that this assessment of Kalmanovitz's state of mind is correct, it does little to advance his case. Material misstatements and omissions in proxy materials and failures to file required reports are no less harmful to the investing public when the violator, knowing the nature and the consequences of his actions, does not obtain adequate legal advice than when he ignores the advice he receives. Here, Kalmanovitz saw omissions and misstatements and did nothing to correct them. He failed to file required reports. He construed Commission refusals to give detailed comments on documents it stated were materially deficient as being equivalent to its having said "no comment." Whether actuated by bad faith or simple ignorance of the law, he violated the law, and the pattern of past violations indicates that he is reasonably likely to do so in the future. Judge Corcoran acted properly in enjoining Kalmanovitz from future violations.[34]

## VII. CONCLUSION

Our review of this case demonstrates clearly that both Falstaff and Kalmanovitz violated the securities laws in numerous ways. Some charges, to be sure, overlap, but the record nonetheless reveals multiple occasions on which they withheld information, failed to file required reports, or filed inaccurate ones. In light of these violations, the district court acted properly in enjoining both Falstaff and Kalmanovitz from further misconduct. Therefore, the judgments of the district court are

*Affirmed.*

illegal is unnecessary. *See* pp. 76-77 *supra.* Subjective assessments of legality may be relevant, however, in determining whether there is a likelihood that the defendant will violate the securities laws again and, therefore, in whether an injunction should be issued.

**33.** Counsel stated at oral argument that Kalmanovitz misunderstood that when the Commission refused to cooperate by pointing out the errors it was not saying "no comment." We find it difficult to believe this assertion when the Commission expressly stated that it had found the 1977 proxy statement to be material-

ly deficient and that issuing it would be at Falstaff's own risk. Kalmanovitz did not react to the Commission's failure to give detailed comments by seeking further legal advice. Instead, he had Falstaff issue the proxy statement as it read, adding only the misleading "no comment" paragraph. *See* note 19 *supra.*

**34.** Kalmanovitz also points to his age—he is in his mid-70's—as undermining a likelihood of future violations. We will not overturn the district court's injunction, however, solely on speculation about the length of Kalmanovitz's tenure at Falstaff or his longevity.