**Harry LEWIS, Plaintiff,**

**v.**

**Robert F. BYRNES, et al., Defendants.**

**No. 81 Civ. 2372–CSH.**

United States District Court,
S. D. New York.

May 21, 1982.

**2.** *See Kirtz v. Advanced Instruments, Inc., supra.*

Garwin, Bronzaft & Gerstein, New York City, for plaintiff; Bertram Bronzaft, New York City, of counsel.

Olshan, Grundman & Frome, New York City, for defendant Korman; David Parker, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff, a shareholder of defendant Horn & Hardart Company ("H&H") brings this derivative action asserting that H&H, various of its directors and officers, and several others violated § 14 and § 10 of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78n and 78j [1976]). Plaintiff alleges that defendants, through the means of a false and misleading proxy statement issued by H&H, fraudulently obtained shareholder approval of the acquisition of a hotel and casino from a corporation largely owned by defendant David J. Korman. As part of this purchase, H&H issued certain securities, some of which were received by Korman and subsequently sold by him to the other individual defendants. Plaintiff asserts that these transactions were part of a scheme by which the defendants undertook to defraud H&H shareholders for their own pecuniary benefit.

Korman now moves, pursuant to F.R. Civ.P. 12, to dismiss plaintiff's complaint against him. The crux of his argument with regard to each of the plaintiff's individual causes of action is that he was insufficiently connected with any of the underlying transactions to warrant liability under the securities laws. He describes himself as "at most a tangential or miscellaneous actor in the scenario giving rise to this lawsuit." (Brief at 11). Korman also moves to strike certain of plaintiff's prayers for relief. For the reasons stated, Korman's motions are denied.

## THE COMPLAINT

The allegations of the complaint, taken as true for the purpose of this motion only, describe the following scheme to defraud H&H. By an agreement dated November 1, 1979, H&H acquired, subject to shareholder approval, the Royal Inn Hotel, two adjacent motels and other related property in Las Vegas, Nevada ("Hotel/Casino Acquisition"). This agreement was reached with University Development Corp. ("UDC"), a Nevada corporation 75% owned by Korman and 25% owned by Neb-Vegas Corp. ("Neb-Vegas"). The acquisition took the form of a merger between H&H and RCI, a corporation owned by Korman and UDC.[1]

---

1. The actual merger was between RCI and Subin Corp., a wholly-owned subsidiary of H&H, which was formed on September 10, 1979, solely for the purpose of this transaction. As a result of the merger, RCI, the surviving corporation, became a wholly-owned subsidiary of H&H.

As part of this merger, H&H issued 115,-000 shares of common stock to Neb-Vegas and 20,000 shares to Korman. Plaintiff alleges that on October 26, 1979, in anticipation of the November 1 agreement, various of the individual defendants ("Purchasers") arranged with Neb-Vegas and Korman to purchase these 135,000 shares of H&H stock for $13.60 per share, slightly less than the then market price of $13.75 per share. In connection with this sale, the complaint alleges that the Purchasers, for no additional consideration, were issued warrants to purchase an additional 135,000 shares on or before December 17, 1983 at $21.33 per share. On December 17, 1979 the Hotel/Casino Acquisition was consummated and the market price of H&H common stock reached $25.50. On March 7, 1980, H&H common stock split two for one.

On November 29, 1979, H&H issued a proxy statement for a Special Meeting of Shareholders to be held on December 14, 1979 to obtain the necessary shareholder approval of the Hotel/Casino Acquisition. The complaint alleges numerous false and misleading statements and omissions in this proxy statement which, plaintiff asserts, was intentionally designed to conceal from the shareholders the actual cost to H&H of the Hotel/Casino Acquisition and that directors, officers and other persons affiliated with them were going to personally benefit from the Acquisition. Plaintiff alleges that the deficiencies in the proxy statement were material and that the proxy statement was issued in furtherance of a conspiracy among the defendants to benefit the Purchasers at the expense of H&H.

The complaint also alleges that the issuance of warrants by H&H to the Purchasers, and the payment of consulting and finder's fees in connection with the Hotel/Casino Acquisition were a waste of corporate assets. Among his prayers for relief, plaintiff asks that the Hotel/Casino Acquisition be declared null and void.

### SECTION 14

Korman argues that the complaint fails to allege a proxy violation under § 14 because there is no allegation of any misstatement or omission by Korman in connection with H&H's proxy materials. He contends that because he was not an officer or director of H&H and had no part in the preparation or the issuance of the proxy materials, he cannot be held liable for any misstatements contained in them. In short, Korman argues that the only connection he is alleged to have with the proxy statement is that his name appears in it, and that this is insufficient, as a matter of law, to sustain any liability under § 14.

■ Section 14(a) of the Securities and Exchange Act forbids "any person ... to solicit or to permit the use of his name to solicit any proxy" in violation of Commission rules." [2] The mere appearance of one's name in a proxy statement does not create liability for any misstatements which appear in the proxy materials. *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 68 (D.C. Cir.1980), *cert. denied sub nom. Kalmanowitz v. SEC*, 449 U.S. 1012, 101 S.Ct. 569, 66 L.Ed.2d 471 (1980); *Yamamoto v. Omiya,*

---

2. In full, this subsection reads:

"It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 781 of this title [Act § 12]." 15 U.S.C. § 78n(a) (1976).

Rule 14a–9 provides in relevant part:

"No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." 17 C.F.R. § 240.14a–9(a) (1979).

564 F.2d 1319, 1322 (9th Cir. 1977). Liability can attach only if there is "a substantial connection between the use of a person's name and the solicitation effort." *Yamamoto v. Omiya, supra*, 564 F.2d at 1323; *SEC v. Falstaff Brewing Corp., supra*, 629 F.2d at 68; *Lewis v. Dansker*, 68 F.R.D. 184, 194 n.2 (S.D.N.Y.1975). The "substantial connection" standard is derived from the express language of the statute which applies not only to one who himself solicits proxies, but also to one who "permit[s] the use of his name to solicit" any proxy.

The "substantial connection" standard was first articulated in *Yamamoto v. Omiya, supra*, which Korman relies on here. There, the Court declined to hold the purchaser of a building liable for errors in a proxy statement sent to the seller's shareholders seeking their approval of the sale. Observing that the purchaser's name was mentioned only twice and confined to a single paragraph of the proxy materials, 564 F.2d at 1322 n.7, the court explained, "It is hardly conceivable that the mere revelation that [the defendant] was the proposed purchaser could have been an inducing factor in the granting of a shareholder's proxy." *Id.*

In *Securities and Exchange Commission v. Falstaff, supra*, by contrast, the court rejected an argument, similar to that made here by Korman, which was premised on the holding in *Yamamoto*. The proxy solicitation in question sought shareholder approval of a transaction transferring a majority interest in the Falstaff Brewing Company to a Paul Kalmanowitz. The court held Kalmanowitz liable under § 14(a) and explained that "Kalmanowitz' reputation as a businessman, his plans for Falstaff, and his other dealings that could create conflicts of interest were important to the existing shareholders, who were being asked to transfer control of the company to him." 629 F.2d at 69.

█ A review of the proxy material at issue here evidences Korman's extensive involvement in the transactions underlying the proxy solicitation. The Hotel/Casino Acquisition took the form of a merger between H&H and RCI, a corporation owned by Korman and UDC, which was itself 75% owned by Korman. In consideration for the merger, Korman was to receive 90,000 shares of H&H common stock. H&H agreed to permit either public or private sale by Korman of 20,000 of these shares, while the remaining 70,000 were to be held by H&H in a voting trust. Korman was also to receive stock options to purchase approximately 80,000 additional shares of H&H common stock over a three-year period. H&H also agreed to arrange a bank loan of $1,000,000 to Korman, to itself lend Korman money to assist him in servicing this bank loan, and to advance him approximately $180,000. 40,000 of the voting trust shares were to be held as collateral on the bank loan and the advance was subject to off-set. H&H agreed that its Board of Directors would elect Korman as a director of H&H to serve until the next annual meeting, and would use its best efforts to cause Korman to be elected a director thereafter. The voting trustees agreed to vote all shares held in trust for the election of Korman as a director whenever there were in excess of 60,000 shares in the voting trust. Finally, H&H agreed to employ Korman under a one-year employment agreement at an annual salary of $50,000.

This transaction was more than a cash sale where the purchaser and seller meet, exchange cash for kind, and go their separate ways. The terms of the transaction necessarily entailed a continuing relationship between H&H and Korman. Korman was to become a director, an employee and a debtor of H&H. In these circumstances, it is true for Korman as it was for Kalmanowitz in the *Falstaff* case that "information about him and his plans certainly was material to the shareholder deciding whether to give his proxy to persons supporting the transaction." *SEC v. Falstaff, supra*, 629 F.2d at 69 n.8. Unlike the situation in the *Yamamoto* case, Korman's identity clearly could have been an inducing factor in a shareholder's grant of his proxy. Thus, Korman permitted the use of his name in a manner substantially connected to the

proxy solicitation such that, as a matter of law, he may be held liable under § 14(a) for any misstatements contained in the proxy materials.[3]

### SECTION 10(b)

■ Korman also argues that plaintiff's section 10(b)[4] claim must be dismissed because it, too, fails to allege that he made any misstatements of material fact. Plaintiff's 10(b) claim, however, is not based solely on the issuance of a deficient proxy statement. Paragraph 42 of the complaint alleges that the proxy statement was issued:

"in furtherance of a conspiracy by and among the defendants solely in order to benefit the purchasers of the shares issued by Neb-Vegas and Korman at the expense of Horn & Hardart and its shareholders."

Thus, issuance of the proxy statement was only one step in the overall fraudulent scheme alleged by the plaintiff; a scheme which also included the issuance of securities to Korman and the sale of those securities by Korman to insiders of the corporation.

The scheme alleged in the complaint contains the bare bones of a section 10(b) violation sufficient to withstand a motion to dismiss at this early stage of the proceedings.[5] Plaintiff is entitled to further discovery to add the necessary flesh to his claims. Korman remains free, at a later point in the proceedings, to test plaintiff's claims by filing a properly supported summary judgment motion.

### WASTE OF CORPORATE ASSETS

■ Korman moves to dismiss plaintiff's claims for waste of corporate assets, again

3. While the complaint fails to expressly allege that Korman knew of the contents of the proxy material, the complaint does allege that the proxy statement was issued in furtherance of a conspiracy of which Korman was a member. Plaintiff now states that he "strongly believe[s] that Mr. Korman, a primary party to the transaction, was fully aware of all of the representations contained in the proxy statement before it was forwarded to H&H's shareholders." Brief at 10. Plaintiff is entitled to explore this factual claim through further discovery. Because of his extensive involvement in the transaction underlying the proxy solicitation, Korman cannot so readily insulate himself from liability for its contents. As has been explained with regard to director-nominees listed in proxy statements:

"[A] director-nominee does have some duty to determine for himself the validity of the proxy materials submitted. These nominees held out their names and reputations to shareholders as evidence that the group backing them was the proper choice to run the corporation. Having put their reputations in issue, the nominees cannot divorce themselves from improper actions taken in the proxy battle by the participants acting under the banner of their names." *Chris-Craft Industries Inc. v. Independent Stockholders Committee*, 354 F.Supp. 895, 915 (D.Del.1973); see also *Lewis v. Dansker*, 68 F.R.D. 184, 194 (S.D.N.Y.1974).

4. This section reads, in relevant part:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of

the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j (1976).

Rule 10b–5 reads:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5 (1979).

5. The allegations in the complaint are also sufficient to state a claim that Korman aided and abetted the 10(b) violation of other of the defendants. See *ITT, An International Investment Trust v. Cornfield*, 619 F.2d 909 (2d Cir. 1980).

claiming that he is insufficiently connected to the underlying transactions to warrant liability. While Korman received none of the warrants issued by H&H, these warrants were issued in connection with the sale of H&H stock by Korman to the other defendants alleged to have conspired with him in the fraudulent scheme. Once again, this connection is sufficient to survive Korman's motion to dismiss. Plaintiff may well have difficulty in demonstrating Korman's connection to the payment of the consulting and finder's fees alleged in the complaint, but, here too, he is entitled to the opportunity to do so.

### MOTION TO STRIKE PRAYER FOR RELIEF

 Finally, Korman moves to strike portions of plaintiff's prayer for relief which he claims are "wholly inappropriate." Korman relies on *Yamamoto v. Omiya, supra,* 564 F.2d at 1323–25, for the proposition that a prayer for equitable relief can be stricken prior to trial. The *Yamamoto* court explained, however, that such action is appropriate only in the very rare case:

> "We do not at all intend to suggest that in every case generally like this, the trial court may properly rule on the scope of remedy prior to trial on the merits. See *Boggess v. Hogan,* 328 F.Supp. 1048, 1054 (N.D.Ill.1971). This is, however, as we have indicated, an unusual case. A mass of pretrial discovery had occurred, resulting in a record of over 3,000 pages. Furthermore, the trial court heard extensive oral argument at which the attorneys fully set forth the facts underlying the case and their positions in respect to the issues." 564 F.2d at 1324.

Here, Korman may be correct that it is simply too late in the day to declare the Hotel/Casino Acquisition null and void. It is undoubtedly correct, however, that it is too early in the day to make this determination.

### CONCLUSION

Defendant Korman's motion to dismiss the complaint against him and to strike portions of plaintiff's prayer for relief is denied.

It is So Ordered.