Roberta SWANSON, individually and on behalf of all others similarly situated, Plaintiff,

v.

WABASH, INC.; Kearney-National, Inc.; the Dyson-Kissner-Moran Corporation; K–N Holdings, Inc.; John Moran; Bushrod Burns, Jr.; Richard Donovan; William Boyd; Jack Hosler and E. Robert Thomas, Jr., Defendants.

No. 83 C 0459.

United States District Court, N.D. Illinois, E.D.

Dec. 16, 1983.

Kurt L. Schultz, Jerome Pope, Winston & Strawn, Marta C. Nomitch, Chicago, Ill., for plaintiff.

James Amend, Stanley Ferguson, Kirkland & Ellis, Scott E. Early, Moylan & Early, Chicago, Ill., for corporation defendants.

Michael W. Coffield, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for Donovan, Hosler, Boyd and Thomas.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

In January of 1981, Kearney-National, Inc. ("Kearney") acquired control of Wabash, Inc. ("Wabash") through a tender offer to Wabash shareholders.[1] Roberta Swanson ("Swanson"), a Louisiana citizen, was one of the shareholders who sold her stock pursuant to the tender offer. Swanson has brought this class action on behalf of herself and the other Wabash shareholders who she claims suffered damages from the defendants' fraud and self-dealing in connection with the tender offer. In particular, Swanson alleges that the defendants violated various federal and state securities laws and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968.[2]

Presently before the Court are three motions: the First Motion of All Defendants to Dismiss, the Second Motion of Certain Defendants to Dismiss and the Plaintiff's Motion for Class Certification.

### I. First Motion of All Defendants to Dismiss

■ The defendants first join in a motion to dismiss all but Count IV of the complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). When confronted by a motion to dismiss, a court must view the allegations of the complaint in the light most favorable to the plaintiff. *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Therefore, unless a plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief, the complaint should not be dismissed under Rule 12(b)(6). *Conley*, 355 U.S. at 45–46, 78 S.Ct. at 102.

### A.

Count I of Swanson's complaint alleges that the defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and S.E.C. Rule 10b–5, 17 C.F.R. § 240.10b–5, by failing to disclose and by misstating certain material facts in connection with the Wabash tender offer. These alleged omissions and misstatements relate to such matters as the nature and duration of the negotiations leading to the tender offer, a plan to restructure Wabash and dispose of certain of its assets and operations, and an agreement to delay the post-tender merger to provide tax advantages to certain shareholders. The defendants argue that even if these matters have been omitted or misstated in the tender offer materials, they are immaterial as a matter of law.

The defendants discuss at considerable length the standard of materiality set forth by the United States Supreme Court. The Court has stated:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a sub-

---

1. The tender offer was actually made through K–N Holdings, Inc. ("K–N"), a wholly-owned Kearney subsidiary established expressly to conduct the tender offer. For purposes of simplicity, we shall not distinguish between the two entities and will refer primarily to Kearney.

2. This Court's jurisdiction is invoked under 15 U.S.C. 78aa, 18 U.S.C. 1964(c), 28 U.S.C. 1332 and principles of pendent jurisdiction.

stantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (footnote omitted).[3]

■ Although they have accurately described the relevant standard of materiality in securities cases, defendants have ignored important aspects of this issue: materiality is "a mixed question of law and fact," and summary judgment on the question of materiality is ordinarily precluded.

[T]he underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and *these assessments are peculiarly ones for the trier of fact.*

*TSC Industries,* 426 U.S. at 450, 96 S.Ct. at 2133 (emphasis added and footnote omitted).[4]

**3.** Although TSC Industries was a proxy case, the test for materiality under Section 10(b) and Rule 10b–5 is the same. *McGrath v. Zenith Radio Corp.,* 651 F.2d 458, 466 n. 4 (7th Cir. 1981), *cert. denied,* 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981).

**4.** Several other courts have stressed that the materiality question usually should be decided by the trier of fact. *E.g., McGrath v. Zenith Radio Corp.,* 651 F.2d 458 (7th Cir.1981), *cert. denied,* 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981); *S.E.C. v. Falstaff Brewing Corp.,* 629 F.2d 62, 76 (D.C.Cir.1980), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 569, 66 L.Ed.2d 471 (1980); *James v. Gerber Products Co.,* 587 F.2d 324 (6th Cir.1978); *S.E.C. v. Bausch & Lomb, Inc.,* 565 F.2d 8, 15 (2d Cir.1977); *Stier v. Smith,* 473 F.2d 1205, 1208 n. 9 (5th Cir.1973).

**5.** The defendants' arguments asserting the immateriality of the specific omissions and misstatements are unpersuasive. Moreover, most of

■ Thus, a court should rarely usurp the role of the trier of fact by determining the issue of materiality as a matter of law. Assuming—as we must for the purposes of this motion—that the alleged omissions and misstatements exist, we decline to hold that no jury or court could ever find that the undisclosed information "would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries,* 426 U.S. at 449, 96 S.Ct. at 2132.[5] Accordingly, the defendants' motion to dismiss Count I of the complaint is denied.[6]

### B.

Count III of the complaint alleges an additional instance of nondisclosure of material facts in the tender offer. In November of 1980, Wabash granted Kearney an option to purchase 325,000 shares of Wabash treasury stock. Swanson claims that the purpose of this option—to help Kearney obtain a majority of Wabash's stock and to deter a competing tender offer—was not disclosed, in violation of Sections 10(b) and 14(e) of the Securities Exchange Act. 15 U.S.C. § 78j(b) and § 78n(e). The defendants argue that the purpose underlying the option need not be disclosed, and that, in any event, the purpose of the offer was disclosed.

the cases cited by the defendants in support of their arguments are not on point, involving motions for a preliminary injunction against a tender offer rather than motions to dismiss. The courts in those cases actually received and weighed evidence in order to determine whether the plaintiffs had established a reasonable likelihood of success on the merits of their claims that material information had not been disclosed. By contrast, the defendants in the present motion ask this Court to decide that undisclosed information is immaterial as a matter of *law.*

**6.** The defendants assert that "because the 10b–5 allegations fail to state claims" and because the language and scope of the Illinois Securities Act of 1953 and Section 10(b) are identical, Swanson's state law claims in Count V must also be dismissed. However, we have just rejected the first premise of this argument. Thus, the defendants' motion to dismiss Count V of the complaint is also denied.

██ We agree. Where the nature and scope of a stock transaction are adequately disclosed to the shareholders, corporate officials need not explain their precise motive or purpose. *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1221 (9th Cir.1980). In two recent cases in the Seventh Circuit, our Court of Appeals has followed this principle.

> [S]ince a shareholder cannot recover under 10b–5 for a breach of fiduciary duty, neither can he "bootstrap" such a claim into a federal securities action by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their activities, or their impure motives for entering the allegedly improper transaction.

*Panter v. Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir.1981), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). *See also Atchley v. Qonaar*, 704 F.2d 355, 358 (7th Cir.1983). The only nondisclosure Swanson alleges regarding the stock option is the defendants' motive underlying the transaction; this is insufficient to state a Section 10(b) or 14(e) claim.[7]

Swanson also alleges in Count III that the stock option granted to Kearney constitutes a manipulative practice which violates Sections 10(b) and 14(e).[8] In support of her claim, Swanson relies primarily on the Sixth Circuit's decision in *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366 (6th Cir. 1981). *Marathon* was the first Court of Appeals case to confront the question of whether "lock up" stock options granted to a tender offeror might be manipulative within the meaning of Section 14(e). The Sixth Circuit held that the stock option in *Marathon* was in fact manipulative. The defendants argue that *Marathon* can be distinguished factually from the present case, and that *Marathon* incorrectly broadened the scope of Section 14(e). As explained below, we are constrained by various Supreme Court and Seventh Circuit decisions to hold that the stock option in this case cannot be deemed manipulative under Section 10(b) or 14(e).[9]

In *Marathon*, Mobil Corporation announced a tender offer to purchase up to 40 million shares of stock of Marathon Oil Company. Marathon's directors wanted to avoid a merger with Mobil, so they searched for a "white knight"—a more attractive candidate for merger. Marathon found U.S. Steel, who offered to purchase 30 million shares of Marathon stock and to merge Marathon with a U.S. Steel subsidiary. U.S. Steel's offer and merger agreement was subject to two conditions: (1) an irrevocable option for the purchase of 10 million authorized but unissued shares of Marathon stock (approximately 17% of Marathon's outstanding shares); and (2) an option for U.S. Steel to purchase Marathon's interest in a valuable oil field, to be exercised only if U.S. Steel's offer failed and a third party gained control of Marathon. *Marathon*, 669 F.2d at 367. Mobil sued to enjoin these two options, claiming, *inter alia*, that the offer was a manipula-

---

7. Moreover, the tender offer materials clearly indicate that the option was designed to help Kearney reach its goal of gaining control of Wabash. The first page of the offer states that Wabash granted the option to Kearney "as an inducement for making the offer," and Kearney's intention to acquire all the remaining Wabash stock (through the tender offer or under the Indiana short-form merger statute) was readily acknowledged throughout the tender offer.

8. Defendants argue initially that Swanson does not raise this claim in her complaint. It is true that the complaint is not as clear as it might be—paragraphs 31 and 33 of Count III refer to both nondisclosure and manipulative acts related to the stock option. Nevertheless, it provides sufficient notice to the defendants of the basis of Swanson's manipulative practice claim, as required by the liberal notice pleading standard of Fed.R.Civ.P. 8(a).

9. At the outset, the close relationship of Sections 10(b) and 14(e) should be noted. Both provisions proscribe manipulative and deceptive acts. In fact, Section 14(e) is modeled after S.E.C. Rule 10b–5, designed to apply the Rule's antifraud prohibitions to tender offers. Thus, the two statutory sections are coextensive in scope and are construed *in pari materia* by the courts. *Panter v. Marshall Field & Co.*, 646 F.2d 271, 282 (7th Cir.1981), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 940–41 (2d Cir.1969).

tive device in violation of Section 14(e) of the Williams Act. *Id.* at 368.

The Sixth Circuit held that each of the two options violated Section 14(e)'s prohibition of manipulative acts. Because "manipulative" is defined in neither the Securities Exchange Act nor the Williams Act, the Sixth Circuit looked to the Supreme Court's description of the term: "It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976) (footnote omitted). The Court of Appeals also considered the statement of the Supreme Court that "No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices." *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977) (Section 10(b)). The Sixth Circuit thus concluded that

> In our view, it is difficult to conceive of a more effective and manipulative device than the "lock-up" options employed here, options which not only artificially affect, but for all practical purposes completely block, normal healthy market activity and, in fact, could be construed as expressly designed solely for that purpose.

*Marathon*, 669 F.2d at 374.

The *Marathon* Court decided that nondisclosure was not the only basis for a 10(b) or 14(e) claim, and that manipulation could exist independent of any misstatement or omission of material facts. *Id.* at 375–76. Such a holding, however, flies in the face of the established interpretation of these statutory provisions. Various Supreme Court and lower federal court decisions have unequivocally stated that Sections 10(b) and 14(e) are intended solely to require full and fair disclosure to investors.

For example, in *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), the Supreme Court closely analyzed the legislative history of Section 14(e). Although the Court was not faced with the precise question before us today,[10] it discussed at length the congressional purpose underlying the statute. The Court observed that "the bill as finally enacted by Congress was styled as a disclosure provision: 'A bill to provide for full disclosure of corporate equity ownership of securities under the Securities Exchange Act of 1934'" *Id.* at 27, 97 S.Ct. at 942 (citation omitted). Moreover, the statute's sponsors "made it clear that the legislation was designed solely to get needed information to the investor." *Id.* at 30–31, 97 S.Ct. at 944.

The Supreme Court discussed the specific meaning of "manipulative" in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

> "Manipulation" is "virtually a term of art when used in connection with securities markets." The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.... Section 10(b)'s general prohibition of practices deemed by the SEC to be "manipulative"—in this technical sense of artificially affecting market activity to mislead investors—is fully consistent with the fundamental purpose of the 1934 Act "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* ...." Indeed, nondisclosure is usually essential to the success of a manipulative scheme.

*Id.* at 476–77, 97 S.Ct. at 1302–03 (citations omitted). It was with this technical view of "deceptive and manipulative" in mind that the Court noted that the case law does "not support the proposition ... that a breach of fiduciary duty by majority stockholders,

---

**10.** The *Piper* Court directly addressed the question of whether tender offerors were intended to be protected by Section 14(e). The Court determined that the statute was passed solely for the benefit of investors and held that tender offerors have no implied cause of action for damages under Section 14(e). *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 42, 97 S.Ct. 926, 950, 51 L.Ed.2d 124 (1977).

**1316**

without any deception, misrepresentation, or nondisclosure, violates the statute [Section 10(b)] and the Rule [10b–5]." *Id.* at 476, 97 S.Ct. at 1302.

In light of these Supreme Court decisions, the Seventh Circuit Court of Appeals has insisted that misrepresentation be pleaded as an essential element of a Section 14(e) cause of action. *Panter v. Marshall Field & Co.*, 646 F.2d 271, 283 (7th Cir.1981), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Atchley v. Qonaar Corp.*, 704 F.2d 355 (7th Cir.1983).[11] We must therefore reject Swanson's argument, adopted from the Sixth Circuit's *Marathon* decision, that the disclosure of the stock option in this case is irrelevant. The rule in this Circuit is that there must be some nondisclosure or misstatement before we can construe the stock option as manipulative. Swanson, however, merely claims that the purpose of the stock option was not disclosed. As explained above, defendants need not have disclosed their motives relating to the stock option. Absent any other allegation of misrepresentation, we are compelled to hold that the stock option is not a manipulative device. Accordingly, the defendants' motion to dismiss the claims in Count III that the stock option transaction violated Sections 10(b) and 14(e) will be granted.

### C.

Count II alleges that defendants Kearney, Dyson-Kissner-Moran ("DKM"), K–N,

John Moran and Bushrod Burns committed two violations of Rule 10b–13, 17 C.F.R. § 240.10b–13, which bars a tender offeror from purchasing securities during a tender offer on terms different from the offer.[12] The defendants argue that neither alleged transaction states a claim upon which relief may be granted.

Swanson first claims that the defendants acquired some shares of Wabash stock, other than pursuant to the tender offer, by purchasing stock options held by certain Wabash executives. The complaint alleges that Kearney, through Burns, purchased these options from the executives for the difference between their option exercise price and the tender offer price. In addition, it is alleged that the option holders were paid a cash bonus equal to 50% of their gain in order to compensate for the tax consequences of the sale of the options. Swanson also claims that two of the executives were paid interest on the amount of their bonuses. Complaint, ¶ 28.

The defendants offer two reasons why, as a matter of law, these allegations fail to describe a violation of Rule 10b–13. First, they claim that this transaction does not constitute a "purchase" of securities within the Rule's prohibitions.[13] The defendants suggest that instead of selling their options "the option holders simply waived or surrendered their option rights."

We disagree with this rather strained interpretation of Swanson's allega-

---

11. The Seventh Circuit is not alone in this view of Section 14(e). *E.g., Buffalo Forge Co. v. Ogden Corp.*, 717 F.2d 757, 759–60 (2d Cir.1983); *Lewis v. McGraw*, 619 F.2d 192 (2d Cir.1980), *cert. denied*, 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980); *Martin Marietta Corp. v. Bendix Corp.*, 549 F.Supp. 623 (D.Md.1982); *accord, Dan River, Inc. v. Icahn*, 701 F.2d 278 (4th Cir.1983).

12. Rule 10b–13 provides in relevant part:

(a) No person who makes a cash tender offer or exchange offer for any equity security shall, directly or indirectly, purchase, or make any arrangement to purchase, any such security (or any other security which is immediately convertible into or exchangeable for such security), otherwise than pursuant to such tender offer or exchange offer, from the time such tender offer or exchange offer is publicly

announced or otherwise made known by such person to holders of the security to be acquired until the expiration of the period, including any extensions thereof, during which securities tendered pursuant to such tender offer or exchange offer may by the terms of such offer be accepted or rejected....

13. The defendants do not contend that the stock options are not "securities." This is proper, as such options clearly are securities within the meaning of the federal securities laws. *E.g., Savino v. E.F. Hutton & Co., Inc.*, 507 F.Supp. 1225, 1235 (S.D.N.Y.1981). *Cf. Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 751, 95 S.Ct. 1917, 1932–33, 44 L.Ed.2d 539 (1975) (puts, calls, options and other contractual rights recognized as securities).

tions. In determining what may be considered a "purchase," we begin by looking to the term's statutory definition. The Securities Exchange Act defines a purchase to include "any contract to buy, purchase, or otherwise acquire" securities. 15 U.S.C. § 78c(a)(13). The Supreme Court has stated that "Section 10(b) must be read flexibly, not technically and restrictively." *Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). Moreover, a statutory "purchase" need not be a technical purchase in the traditional common-law sense. *Broad v. Rockwell International Corporation*, 614 F.2d 418, 435 (5th Cir.1980), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). Rule 10b–13 itself expressly encompasses both direct and indirect purchases and arrangements to purchase securities. Given the complaint's clear allegations that the Wabash executives exchanged their stock options for money, and in light of the broad definition of "purchase" in the Exchange Act, we believe Swanson *has* alleged a purchase of securities.

The defendants argue next that, even if the transaction is considered a purchase, it did not involve any party precluded from purchasing securities under Rule 10b–13. The rule bars purchases made outside the tender offer by the "person who makes a cash tender offer or exchange offer"—i.e., the offeror. The defendants assert that here, the alleged promise to pay the tax bonus was made by the target company (Wabash), and not the offeror (Kearney). Thus, they claim there can be no violation of Rule 10b–13 in this transaction.

We disagree with this reading of the complaint by defendants as well. Swanson has alleged that *Kearney*, acting *through Burns*, purchased the stock options from the Wabash executives. Complaint, ¶ 28. We have already noted that Rule 10b–13 proscribes both direct and indirect purchases of securities outside the tender offer

terms. Therefore, Swanson's allegations concerning the tax bonuses are sufficient to survive the defendants' motion to dismiss under Fed.R.Civ.P. 12(b)(6).

■ Swanson alleges a second instance of the defendants' acquiring securities on terms other than those of the tender offer. She claims that Kearney made an arrangement with certain Wabash shareholders allowing the shareholders to sell their stock to K–N at the tender offer price as late as June, 1981, several months after the tender offer expired. According to Swanson, the purpose of this agreement was to allow those particular shareholders to hold their stock long enough to qualify for long-term capital gain tax treatment. In furtherance of this agreement, defendants allegedly delayed a contemplated freezeout merger from March to June, 1981. Complaint, ¶ 29.

The defendants contend that these allegations fail to state an actionable claim. First, they argue that Rule 10b–13 was not violated because all the non-tendering shareholders who were "cashed out" in the June merger received the same price for their stock at the same time. However, as Swanson points out, the shareholders who were parties to the special arrangement did benefit more than other shareholders who tendered their stock pursuant to the offer and who forfeited long-term capital gain treatment because they were not assured that they could sell their stock in June. Thus, although all the shareholders received the "same price" for their stock, the parties to the arrangement received a real benefit in the form of more favorable tax treatment.[11] This benefit was not made available to all eligible shareholders in the tender offer.

The defendants also argue that there was no agreement to purchase stock other than under the terms of the tender offer because a merger was "unavoidable."

---

14. For another case demonstrating that Rule 10b–13 may be violated when some shareholders are allowed to enjoy special tax treatment, see *Wellman v. Dickinson*, 475 F.Supp. 783, 833–

34 (S.D.N.Y.1979), *aff'd*, 682 F.2d 355 (2d Cir. 1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983).

However, a short-form merger between Wabash and Kearney was by no means inevitable; it could not have occurred until Kearney acquired at least 95% of the Wabash stock. Moreover, this argument ignores the fact that Swanson has alleged an illegal arrangement to purchase stock independent of any delay in carrying out the merger.

In short, we find each of the defendants' arguments concerning the alleged violations of Rule 10b–13 unpersuasive. Accordingly, the motion to dismiss Count II of the complaint is denied.

### D.

Swanson alleges in Counts VI, VII and VIII of her complaint that the defendants have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. The civil damage provision of RICO, Section 1964(c), creates a private right of action with treble damage recovery for "[a]ny person injured in his business or property by reason of a violation of [Section 1962]." Section 1962 makes it unlawful for any person (a) to invest income derived from a "pattern of racketeering activity" in an enterprise engaged in, or whose activities affect, interstate commerce; (b) to maintain or acquire an interest, through a "pattern of racketeering activity," in an enterprise engaged in or whose activities affect interstate commerce; (c) to conduct the affairs of an enterprise that is engaged in, or whose activities affect, interstate commerce through a "pattern of racketeering activity"; or (d) to conspire to commit any of these first three violations. A "pattern of racketeering activity" is defined in Section 1961 as at least two occurrences within ten years of any of several predicate offenses, including mail fraud, bribery and fraud in the sale of securities.

The defendants argue that Swanson has failed to state claims under RICO for two reasons. First, they contend that the RICO claims are defective because they do not allege the involvement of "organized crime." Second, the defendants maintain that Swanson is required to allege injury resulting from the operation of an enterprise through racketeering activity, rather than merely alleging injury caused by the predicate offenses themselves. However, the Seventh Circuit Court of Appeals has recently considered—and rejected—both of these arguments. The defendants' motion to dismiss the RICO claims must therefore be denied.

 The defendants' first argument requires little discussion. It is clear that Congress intended RICO to serve primarily as a weapon in the fight against organized crime.[15] Nevertheless, Congress did not limit the scope of RICO to persons connected with organized crime; it focused instead on particular activities and provided remedies against any persons engaging in them. Thus, on its face the statute does not require any association between RICO defendants and organized crime. The Court of Appeals for the Seventh Circuit has repeatedly refused to add such a requirement. *United States v. Aleman*, 609 F.2d 298, 303–304 (7th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *Schacht v. Brown*, 711 F.2d 1343, 1356 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983). In its most recent opinion relating to RICO, the Seventh Circuit labeled the argument that the statute requires some connection with organized crime as "specious." *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1287 n. 6 (7th Cir.1983).

 The defendants' second argument cannot be stated so succinctly. They assert that Swanson must allege a "racketeering enterprise injury"—some injury above and beyond that caused by the predicate acts which constitute the "racketeering activity." In support of their assertion, the defendants point to the decisions of several federal district courts as well as that of the Seventh Circuit in *Schacht v. Brown*, 711 F.2d 1343 (7th Cir.1983), *cert.*

---

**15.** See, *e.g.*, Senator Dole's remarks at 116 Cong. Rec. 36,296 (1970).

*denied,* —— U.S. ——, 104 S.Ct. 509, 78 L.Ed.2d —— (1983). However, *Schacht* actually controverts the defendants' position.

The defendants in *Schacht* made two similar, if not identical, arguments which are relevant to this case. First, the defendants claimed that the plaintiff must allege some "competitive" or "indirect" injury to state a RICO claim. *Id.* at 1356. Second, the defendants made the same assertion that we are now considering: that the plaintiff must plead injury by reason of the operation of an enterprise through the underlying pattern of racketeering, not by reason of the predicate offense itself. *Id.* at 1358. The Seventh Circuit did not expressly recognize the strong similarity of these two claims. Rather, the Court discussed the claims in separate sections of its opinion, rejecting the former argument and determining that it need not reach the latter one. However, in its discussion of the defendants' first argument (concerning competitive or indirect injury) the Court also rejected, at least implicitly, the racketeering enterprise injury claim.

The Court in *Schacht* noted that some district courts have sought to limit RICO's private right of action by requiring an allegation of competitive or indirect injury.[16] The Seventh Circuit, however, rejected this "crabbed interpretation" of RICO, because it neither agrees with the plain language of the statute nor fulfills the purposes of RICO or the Congressional intent. *Id.* at 1357, 1358. The Court also pointed out that the majority of courts and commentators have rejected a competitive injury requirement. *Id.* at 1357.

Many of the courts and commentators cited by the Seventh Circuit have also discussed—and rejected—the argument that a RICO plaintiff must allege a racketeering enterprise injury. Indeed, several of these authorities have considered the competitive injury and racketeering enterprise injury arguments to be essentially the same. *See, e.g.,* Strafer, Massumi & Skolnick, *Civil*

*RICO in the Public Interest: "Everybody's Darling",* 19 Am.Crim.L.Rev. 655, 707 (1982) (the racketeering enterprise injury argument is "a more elaborate version" of the competitive injury limitation); Note, *Civil RICO: The Temptation and Impropriety of Judicial Restriction,* 95 Harv.L. Rev. 1101, 1110 n. 51 (1982) (the two requirements are "hard to distinguish," even given one court's explanation of how they differ). One of the four cases which the *Schacht* Court criticized for accepting the competitive injury argument treated the ideas of "competitive injury" and "racketeering enterprise injury" interchangeably, while another did not even refer to "competitive injury" but spoke in terms of requiring injury other than from the predicate acts of racketeering. *North Barrington Development, Inc. v. Fanslow,* 547 F.Supp. 207 (N.D.Ill.1980); *Erlbaum v. Erlbaum,* [Current] Fed.Sec.L.Rep. ¶ 98,-772 (E.D.Pa.1982). Thus, although the Seventh Circuit did not pass expressly on the need for racketeering enterprise injury in RICO cases, many of the authorities upon which it relied *had* considered the question.

Even if the Court in *Schacht* did not intend to implicitly reject the racketeering enterprise injury argument, we agree with those authorities which state that no such restriction should be judicially imposed upon the RICO statute. In the first place, we have found no basis for requiring a racketeering enterprise injury in the statutory language. As one New York district judge observed recently,

> Part (b), for instance, of section 1962, simply makes it unlawful to conduct the affairs of an enterprise engaged in interstate commerce through a pattern of racketeering injury. A brokerage enterprise infiltrated by organized crime and engaged in defrauding its customers through acts like those alleged here might injure no one but the customers of the enterprise. There would be no injury above and beyond that caused by the

---

16. To justify such a requirement, these courts have generally relied on Congress' concern with the impact of organized crime infiltration upon free competition and the structural similarities of the RICO statute and the antitrust laws.

predicate acts of fraud forming the "pattern of racketeering activity." Such conduct, however, would violate RICO and would be near the center of Congress' concern. In addition, § 1964(c) simply provides that "any person ... injured by reason of a violation of section 1962" may invoke RICO's civil remedies. I can imagine no construction of those words which would exclude from their coverage the primary victims of such a scheme and which would render such defendants immune from civil sanctions.

*Mauriber v. Shearson/American Express, Inc.,* 567 F.Supp. 1231, 1240 (S.D.N.Y. 1983).

Moreover, limiting RICO's remedies to plaintiffs who can allege some racketeering enterprise injury would be inconsistent with the statute's legislative history. The aim of the civil RICO provisions is to "divest the association of the fruits of its ill-gotten gains." *United States v. Turkette,* 452 U.S. 576, 585, 101 S.Ct. 2524, 2530, 69 L.Ed.2d 246 (1981). This purpose would be significantly undermined if persons who were directly harmed by racketeering activity made illegal by the statute could not recover without demonstrating some special injury. "Such a rule would leave money derived from actions prohibited by RICO precisely where Congress did not intend it to remain, in the hands of RICO violators." *Crocker National Bank v. Rockwell International Corporation,* 555 F.Supp. 47, 50 (N.D.Cal.1982).

As in the case of the competitive injury restriction, courts have justified the racketeering enterprise injury requirement as a means of preventing RICO from transforming state law violations into federal law violations and from subjecting perpetrators of ordinary securities fraud to treble damage liability. *E.g., Adair v. Hunt International Resources Corp.,* 526 F.Supp. 736 (N.D.Ill.1981); *Johnsen v. Rogers,* 551 F.Supp. 281 (C.D.Cal.1982). However, the short answer to this argument has been recognized by both the Supreme Court and the Seventh Circuit: Congress knew what it was doing when it worded RICO so broadly. In the criminal context, the Supreme Court has stated

As the hearings and legislative debates reveal, Congress was well aware of the fear that RICO would "mov[e] large substantive areas formerly totally within the police power of the State into the Federal realm." In the face of these objections, Congress nonetheless proceeded to enact the measure, knowing that it would alter somewhat the role of the Federal Government in the war against organized crime and that the alteration would entail prosecutions involving acts of racketeering that are also crimes under state law. There is no argument that Congress acted beyond its power in so doing. That being the case, the courts are without authority to restrict the application of the statute.

*United States v. Turkette,* 452 U.S. 576, 586–87, 101 S.Ct. 2524, 2530–31, 69 L.Ed.2d 246 (1981) (citations omitted). As the Seventh Circuit noted in *Schacht,*

If Congress wishes to avoid the inclusion under RICO's umbrella of "garden variety" fraud claims involving the operation of enterprises through mail and securities fraud, it may easily do so through removing mail and securities fraud from the list of predicate acts enumerated in § 1961. That is not, however, a program which may be undertaken by this court.

*Schacht,* 711 F.2d at 1356.

In this case, Swanson has made all the necessary allegations. She alleges the existence of at least one enterprise and the requisite offenses which constitute a pattern of racketeering activity. Furthermore, Swanson alleges that she suffered injury to her business or property by reason of the defendants' racketeering activity in violation of Section 1962. These allegations are sufficient to withstand the defendants' motion to dismiss.

## II. *Second Motion of Certain Defendants to Dismiss*

In the second motion, separate groups of defendants argue that particular counts of the complaint do not properly state claims against them. First, defendants Wabash,

Richard Donovan ("Donovan"), William Boyd ("Boyd"), Jack Hosler ("Hosler") and E. Robert Thomas ("Thomas") claim that Counts I and III fail to allege fraud with the specificity required by Fed.R.Civ.P. 9(b). Second, defendants DKM, John Moran ("Moran") and Bushrod Burns ("Burns") argue that they should be dismissed from Count II because S.E.C. Rule 10b–13 does not apply to them. As explained below, we are not persuaded by either argument and therefore deny the motion in its entirety.

**A.**

■ Federal Rule of Civil Procedure 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." In *Tomera v. Galt*, 511 F.2d 504 (7th Cir.1975), the Seventh Circuit set forth a liberal interpretation of Rule 9(b), stating that it must be read together with the notice pleading standard of Rule 8. The Court held that Rule 9(b) was satisfied by a "brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants." *Id.* at 509.

Judged by this standard, Swanson's complaint clearly provides the defendants with the notice to which they are entitled. The complaint specifies in considerable detail the fraudulent acts in which all the defendants were allegedly engaged. It also states the particular misstatements and omissions of material facts that were allegedly made in the course of the tender offer, and that all the defendants knowingly "participated or substantially aided and abetted consummation of the Offer through the dissemination of false and misleading statements." Complaint, ¶ 23. As the Court in *Tomera* stated, "This is enough. More information can be gathered through discovery." *Tomera*, 511 F.2d at 519.

■ The defendants making this motion—Wabash and four of its former officers and directors—also contend that a target company is not liable for alleged omissions or misstatements in tender offer materials issued by the offeror.[17] Although such liability certainly does not exist in all cases, we believe that it could arise when the target company's officers or directors act in concert with the offeror in a fraudulent scheme. Our belief is buttressed by the Seventh Circuit's decision in *Brennan v. Midwestern United Life Insurance Co.*, 417 F.2d 147 (7th Cir.1969) (corporate defendant may be liable for giving active and knowing assistance to a third party engaged in fraudulent activities violating the securities laws), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970), and by cases in other circuits imposing liability on those who aid and abet securities law violations. *E.g.*, *S.E.C. v. Washington County Utility District*, 676 F.2d 218 (6th Cir. 1982); *Edward J. Mawod & Co. v. S.E.C.*, 591 F.2d 588 (10th Cir.1979); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir.1978), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). As noted above, Swanson includes aiding and abetting as a basis for holding the defendants liable for the wrongs she has alleged. Accordingly, the motion of Wabash, Donovan, Boyd, Hosler and Thomas to be dismissed from Counts I and III is denied.

17. The two cases cited by the defendants to support this proposition are inapposite. In *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir.1973), the court merely held that the target company's failure to rectify omissions in a tender offeror's materials did not excuse the offeror from liability for failing to disclose material facts to shareholders. The court did not discuss the question of whether the target company might *also* be liable for the omissions. In the second case, *In re Commonwealth Oil/Tesoro Petroleum Corp. Securities Litigation*, 467 F.Supp. 227 (W.D.Tex.1979), the court declined to "impose a duty to disclose the misleading nature of a statement on parties that were neither the source nor the subject of the statements and were unaware of their falsity at the time of publication." *Id.* at 240. As alleged by Swanson, the defendants here stand in a much different posture, closer to and aware of the misrepresentations.

### B.

The second part of this motion relates to Count II of Swanson's complaint, which is discussed in Section I.C. above. Claiming that Rule 10b–13 does not apply to them, defendants DKM, Moran and Burns argue that they should be dismissed from Count II. We disagree and hold that dismissing these defendants at this stage of the proceedings would be inappropriate.

In order to evaluate their argument, it is necessary to understand the relationship of DKM, Moran and Burns to Kearney. DKM is Kearney's parent corporation. According to the tender offer, DKM and DKM's officers, directors, shareholders, members of their families and their affiliates own approximately 63% of Kearney's outstanding common stock. Swanson alleges that when stock options and warrants are considered, DKM and these related parties own approximately 92% of Kearney's equity. Moran was the President of DKM and a DKM shareholder at the time of the tender offer. Burns was President and Chairman of the Board of Kearney when the offer was made; Swanson alleges that Burns also was Vice-President of DKM at this time.

DKM, Moran and Burns claim that only the tender offeror itself may be held liable for violating Rule 10b–13. They argue that the Rule prohibits only a "person who makes a cash tender offer" from purchasing stock outside the terms of the offer, and that they did not make any tender offer. Thus, they claim, Rule 10b–13 does not apply to them. The defendants cite no case which supports this assertion, but rely instead on the differences in language between the Rule and Rule 10b–5, which broadly proscribes "any person" from employing manipulative and deceptive devices in connection with the purchase or sale of securities. Despite its initial appeal, we find this argument unpersuasive.

■ Section 10(b) of the Securities Exchange Act of 1934 makes it "unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–13 is one of the rules and regulations promulgated by the S.E.C., as authorized by Section 10(b), which describe specific illegal practices. We feel that Rule 10b–13 may be best understood when it is viewed as a component of Section 10(b) and the Section's expansive prohibition of manipulative and deceptive devices and practices, rather than when it is read in isolation. *Cf. S.E.C. v. North American Research and Development Corp.*, 424 F.2d 63 (2d Cir.1970) (federal securities statutes should be viewed not individually, but as interdependent parts of an integrated regulatory plan). Thus, although Rule 10b–13 focuses on the purchase of stock by a tender offeror, other parties acting with or on behalf of a tender offeror may also violate the Rule by their conduct. This is consistent with Section 10(b)'s prohibiting *any* person from engaging in *any* manipulative or deceptive act.[18]

Reported cases discussing Rule 10b–13 are scarce, but in at least one such case the court found parties other than a tender offeror liable for violating the Rule. In *S.E.C. v. Roussel*, 485 F.Supp. 295 (D.Kan. 1980), the court found that a securities broker dealer, and its principals and employees, had violated Rule 10b–13 by purchasing stock for a tender offeror. As the defendants correctly point out, the issue of who is covered by Rule 10b–13 was not expressly decided by the court in *Roussel*. On the other hand, the fact that the S.E.C. charged the *Roussel* defendants with violating Rule 10b–13 may be some indication of how the Commission which promulgated the Rule interprets its scope.

18. Moreover, even if parties other than a tender offeror could not directly violate Rule 10b–13, they might be liable for aiding and abetting the tender offeror in its violation, as discussed in Section II. A. of this opinion.

■ In this case, Swanson alleges that the defendants were closely involved in activities proscribed by Rule 10b–13. Burns and Moran are each named specifically as having had an active role in one of the alleged Rule 10b–13 violations. Complaint, ¶¶ 28, 29. DKM might also be liable as Kearney's parent. The defendants have stated in their brief, "In this case the tender offer was made by Kearney-National's wholly-owned subsidiary, K–N Holdings, Inc. Kearney-National does not deny that it was effectively the purchaser, since it owned 100% of K–N Holdings." We are presently unable to say that DKM's relationship to Kearney can be distinguished significantly from Kearney's relationship to K–N. For these reasons, the motion of DKM, Burns and Moran to be dismissed from Count II is denied.

### III. *Plaintiff's Motion for Class Certification*

Finally, we consider Swanson's motion for certification of this lawsuit as a class action, in which she would represent herself and all other persons—except the defendants—who sold their shares of Wabash stock pursuant to Kearney's tender offer. Fed.R.Civ.P. 23(a), (b)(3). The defendants oppose class certification on the grounds that Swanson's claims are not typical of the claims of the class and that Swanson will not fairly and adequately protect the interests of the class, contrary to the requirements of Fed.R.Civ.P. 23(a)(3) and (4). We believe that the defendants' objections, while not completely without merit, do not require us to deny Swanson's motion. Accordingly, we will certify the class subject to the conditions set forth below.

■ Rule 23(a) contains four prerequisites to bringing a suit as a class action: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly

and adequately protect the interests of the class.

The defendants apparently concede by their failure to object to the first two prerequisites that these are satisfied. We agree that the proposed class meets both of these requirements. According to the tender offering circular, there were 1,781,-075 shares of Wabash stock held by approximately 5,500 shareholders as of December 1, 1980. This is certainly enough to satisfy the threshold requirement of numerosity. *See, e.g., Swanson v. American Consumer Industries, Inc.,* 415 F.2d 1326, 1333 n. 9 (7th Cir.1969) (class of 40 would be sufficient); *Hochschuler v. G.D. Searle & Co.,* 82 F.R.D. 339, 343 (N.D.Ill.1978) (class of over 1,000 obviously sufficient). Moreover, the questions of law or fact common to this proposed class include whether the defendants made material misstatements and omissions of fact in connection with the Kearney tender offer and whether the defendants' other activities constitute violations of the state and federal securities laws and the RICO statute. These questions are relevant to the claims of every Wabash shareholder, and they are sufficient to satisfy the second requirement of Rule 23(a). *Issen v. GSC Enterprises, Inc.,* 522 F.Supp. 390, 401 (N.D.Ill.1981); *Helfand v. Cenco, Inc.,* 80 F.R.D. 1, 6 (N.D.Ill.1977).

■ The third prerequisite for class certification is that the claims or defenses of the representative be typical of the claims or defenses of the class. As the Seventh Circuit noted recently, this requirement focuses on whether the named representative's claims have the same essential characteristics as the claims of the class at large. *De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983). A plaintiff's claims are typical if they arise from the same events or course of conduct giving rise to the claims of other class members and his or her claims are based on the same legal theory. The typicality requirement may be satisfied even if there are factual differences between the plaintiff's claims and the claims of other

class members. *Id.; Resnick v. American Dental Ass'n,* 90 F.R.D. 530, 539 (N.D.Ill. 1981).

█ The defendants offer several reasons why Swanson does not meet this requirement. They first contend that Swanson's claims are not typical of the claims of the proposed class because she was not harmed by the Rule 10b–13 violations alleged in Count II of her complaint. Indeed, only some of the Wabash shareholders were eligible for the long-term capital gain tax treatment which Swanson alleges certain shareholders were illegally permitted to receive, and Swanson apparently was not one of those eligible persons. Swanson Deposition at 140. However, this fact alone is not enough to support the defendants' assertion that "since she was not 'harmed' by the alleged improperly favorable tax treatment granted to some Wabash shareholders, Swanson cannot serve as class representative."

Count II is merely one of eight counts in Swanson's complaint, and her other claims—based on the defendants' alleged breaches of fiduciary duty and violations of securities laws and RICO—are precisely the same claims that all the Wabash shareholders might make. Swanson's inability to prove that she individually suffered harm from the violations alleged in Count II does not make her claims inimical to those of the proposed class. Differences in the degree of harm suffered, or even in the ability to prove damages, do not necessarily vitiate the typicality of a plaintiff's claim. *Ouellette v. International Paper Co.,* 86 F.R.D. 476, 480 (D.Vt.1980); *Sanders v. Faraday Laboratories, Inc.,* 82 F.R.D. 99, 101 (E.D.N.Y.1979); *Mersay v. First Republic Corporation of America,* 43 F.R.D. 465, 468–69 (S.D.N.Y.1968). We thus reject defendants' assertion that this absence of injury makes Swanson's claims atypical.

In effect, the defendants have argued that Swanson does not have standing to state the claims in Count II. Rather than denying Swanson's motion for class certification on this basis (as the defendants propose), we feel that the proper solution is to condition class certification on the addition of at least one Wabash shareholder who *can* assert the Count II claims.[19] Adding such a representative should eliminate the grounds for the defendants' objection, whether phrased in terms of standing or typicality.[20]

The defendants' remaining objections to Swanson's typicality as a class representative—and to her ability to fairly and adequately represent the interests of the class, as required by Rule 23(a)(4)—are based on the fact that Swanson's nephew is Frank Peters ("Peters"), a former officer and director of Wabash. Peters resigned from Wabash in June, 1981, and started a competing business. After he left Wabash, Peters also initiated a series of suits against some of the companies and individuals who are defendants in this action.

█ The defendants assert that Swanson is an improper class representative because her motives in bringing this suit are "open to question." Calling her "Peters' stalking-horse," they suggest that Swanson is merely helping her nephew seek revenge against the defendants. However, even if Swanson has such an ulterior motive, we do not believe that it is necessarily antagonistic to the class. We are concerned with the adequacy of Swanson's representation, not with her motives for bringing the lawsuit. *Denny v. Carey,* 73 F.R.D. 654, 657 (E.D.Pa.1977); *Lewis v. Black,* 74 F.R.D. 1, 3 (E.D.N.Y.1975); *Dorfman v. First Boston Corp.,* 62 F.R.D. 466, 473 (E.D.Pa.1973); *First American Corp. v. Foster,* 51 F.R.D. 248, 250 (N.D. Ga.1970).

19. Our authority to fashion this condition is granted by Fed.R.Civ.P. 23(c)(1) and (d)(3), as explained in more detail later in this opinion.

20. Swanson is given 30 days to amend her complaint accordingly. If she does not do so, we assume defendants will make the appropriate motion.

The defendants also contend that Swanson cannot serve as a class representative in this action because her relationship to Peters creates an arguable defense peculiar to her which will become a major issue in this case and impose a disadvantage on the remainder of the class. Specifically, the defendants claim that the timing of Swanson's purchases of Wabash stock raises "serious questions" as to whether she was a tippee. We are not persuaded by this argument. First, there is no factual support in the record for the claim that Swanson actually was a tippee. We need not disqualify Swanson merely because she is somehow related to an insider. *See, e.g., Greene v. Emersons Ltd.,* 86 F.R.D. 47 (S.D.N.Y.1980).[21] Second, we disagree with the defendants' claims that this defense (if it is indeed a defense) is unique to Swanson and that Swanson's serving as a class representative would in itself result in the interjection of numerous new issues into this case. The primary issues in this case are whether the defendants have violated various state and federal securities laws and the RICO statute. Swanson's relationship to Peters is irrelevant to the question of the defendants' liability for any such violations. To the extent that it is relevant, the Swanson-Peters relationship will become an issue only when the damages recoverable by the individual class members are determined. At this point in the case, defendants will be able to present any defenses they have against the members of the class, and they may argue that Swanson *or any other class members* were tippees. *Cf. Issen v. GSC Enterprises, Inc.,* 522 F.Supp. 390, 403 (N.D.Ill.1981); *Hurwitz v. R.B. Jones Corp.,* 76 F.R.D. 149, 158 (W.D.Mo.1977) (defense of lack of reliance is not unique and does not preclude plaintiff from representing class). No new issues are created by Swanson's representing the class, because the defendants may raise any defenses they have against any individual class member no matter who represents the class.

The most serious objection to Swanson's representation of the class is defendants' assertion that Peters might also be an appropriate defendant in this case. They contend that Peters took part in some of the activities which Swanson alleges were illegal, such as the preliminary merger negotiations which were not disclosed to the shareholders (Count I) and the tax bonus agreement (Count II). In fact, Peters has not denied his involvement in these activities and has even sued certain defendants to collect the tax bonus. The defendants claim that in spite of these indications that Peters should also be a defendant in this case, Swanson has been reluctant to sue her nephew. They stress that a proper class representative must not let personal relationships dictate her litigation strategy.

Swanson argues that there are valid reasons supporting the decision not to sue Peters. For example, she states that although Peters did attend the preliminary negotiations, he did not participate in the drafting of the offering circular which contains the misstatements and omissions described in Count I. Swanson also argues that even if some evidence were to implicate Peters in the fraudulent activities, he need not be named as a defendant because the joinder of joint tortfeasors is permissible but not compulsory. Finally, Swanson claims that she would name Peters as a defendant if the evidence warranted it and her counsel recommended doing so.

We agree with the defendants that Swanson may be less inclined to sue Peters than other class members might be.[22] We also

---

**21.** Moreover, several courts have permitted insiders and tippees themselves to act as class representatives. *E.g., Hochschuler v. G.D. Searle & Co.,* 82 F.R.D. 339 (N.D.Ill.1978); *Reichlin v. Wolfson,* 47 F.R.D. 537 (S.D.N.Y. 1969); *Fogel v. Wolfgang,* 47 F.R.D. 213 (S.D.N.Y.1969); *see also* 7 C. Wright & A. Miller, Federal Practice and Procedure § 1768 (1972). Thus, even if Swanson were a tippee she need not be precluded automatically from representing the class.

**22.** The defendants also make much of the fact that one of Swanson's attorneys is dating Peters, and they imply that she would never advise Swanson to sue Peters. However, we do not feel that Peters' relationship to this attorney poses any additional problem. Swanson's lead

feel that the members of the class could have an interest in suing Peters separate from their interest in suing the other defendants already in this action.[23] However, we do not believe that this requires us to deny the class certification motion.

Once more, we feel that adding another class representative is the proper solution. Thus, we will condition class certification on the addition of at least one representative who is neither a member of Peters' family nor a social or business acquaintance of Peters.[24] This person, together with his or her legal counsel, may then decide whether Peters should be named as another defendant in this action. In doing so, we believe this representative will ensure that all the interests of the class members are fairly and adequately represented.[25]

■ Finally, before this matter can proceed as a class action, Swanson must show "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Swanson has

done so. We have already discussed some of the common questions of law and fact in this case and have determined that this type of suit is uniquely suited to class action treatment. *Issen v. GSC Enterprises, Inc.,* 522 F.Supp. 390, 400 (N.D.Ill.1981).

Accordingly, Swanson's motion for class certification is granted, subject to the conditions explained above. It is so ordered.

---

counsel is the law firm of Winston & Strawn, whose objectivity even the defendants do not question. Moreover, once this action proceeds as a class action, the attorneys will have a fiduciary duty to all the class members. If Peters should be named as a defendant, any attorney with a conflict of interest has an obligation to withdraw from the case.

**23.** Although the liability of joint tortfeasors is joint and several, a plaintiff's chances of recovering the damages to which he is entitled increase with the inclusion of more tortfeasors as defendants in the action.

**24.** This new class representative may (but need not) be the same person who is selected because he can assert the claims in Count II of the complaint. We are requiring additional representation for two separate reasons, but one person may be able to satisfy both requirements. This representative should be selected within 30 days. See footnote 20, *supra.*

**25.** Courts have considerable flexibility under Rule 23 in determining how class actions shall proceed. Subsections (c)(1) and (d)(3) of the

Rule both provide for the imposition of conditions on the representative parties, and the Advisory Committee Note to Rule 23(c)(1) states that a class certification order "can be conditional; the court may rule, for example, that a class action may be maintained only if the representation is improved through intervention of additional parties of a stated type." This is precisely what we have done.

If it later appears that any of the representatives (or their counsel) impair the adequate representation of the class, we are free to make appropriate adjustments. *E.g., First American Corporation v. Foster,* 51 F.R.D. 248, 250 (N.D.Ga. 1970).

Courts in a number of other cases have required additional plaintiffs or lawyers to represent the absentee class members. *E.g., Ernst & Ernst v. United States District Court for the Southern District of Texas,* 457 F.2d 1399 (5th Cir.1972) (adding a representative with respect to whom the objections made to the original plaintiff's serving as a representative were not applicable); *Cullen v. New York State Civil Service Commission,* 435 F.Supp. 546 (E.D.N.Y.1977) (lawyer); *Herrmann v. Atlantic Richfield Co.,* 65 F.R.D. 585 (W.D.Pa.1974) (plaintiff).